Trooper Alvin T. PONTARELLI, et al.,

v.

Walter E. STONE, et al.

Civ. A. No. 86–0370.

United States District Court,
D. Rhode Island.

May 19, 1989.

Ina P. Schiff, Providence, R.I., for plaintiffs.

Robin E. Feder, office of the Atty. Gen., Kurt Hayes, Providence, R.I., for State of R.I. and Arlene Violet.

## MEMORANDUM AND ORDER

TORRES, District Judge.

The "Plaintiffs" have moved, pursuant to Fed.R.App.P. 4(a)(5), for an extension of time in which to file a "new" notice of appeal from a final judgment entered on February 2, 1989. The motion was filed in apparent response to an order issued by the United States Court of Appeals for the First Circuit indicating that a prior "amended" notice of appeal was deficient because it failed to "name the appellants taking the appeal" as required by Fed.R. App.P. 3(c). That order also directed the "Plaintiffs" to show cause why their appeal should not be dismissed.

The stated purpose of the requested extension is to permit the "Plaintiffs" to "specifically name the appellants in the body of the notice of appeal." "Plaintiffs' Motion for an Extension of Time to Appeal," at 1. The defendants object on the ground that the "Plaintiffs" have failed to demonstrate "excusable neglect" or "good cause" as required by Rule 4(a)(5).

### THE PROCEDURAL HISTORY

Before proceeding to the merits of "Plaintiffs'" motion, it is necessary to briefly summarize the rather tangled procedural history of this case. That history begins with the eight count complaint that was filed on behalf of Rhode Island State Police Lodge 25, FOP, several of its male officers and two of its female members, Linda Bailey and Mary Nunes. Trooper Nunes became a member of the Rhode Island State Police after successfully completing the 1985/86 Training Academy for new recruits. The other individual "Plaintiffs" had become members prior to that time. The defendants are Walter E. Stone and Lionel Benjamin, the superintendent and executive officer, respectively, of the Rhode Island State Police; Walter T. Reynolds, the officer charged with responsibility for conducting the 1985/86 Training Academy; Arlene Violet, the Attorney General of the State of Rhode Island during the time the Academy was being conducted, and the State itself.

Counts I and II are directed at Colonel Stone, Major Benjamin and the State. They allege a continuing practice of sex discrimination during an unspecified period of time apparently prior to the 1985/86 Training Academy in violation of 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e et seq.), respectively. Counts III and IV contain similar allegations against all five defendants during the Training Academy itself.

Counts V and VI charge sex discrimination and retaliation by Stone, Benjamin, Reynolds, and the State, apparently during the period between the conclusion of the Training Academy and the filing of the complaint. Like the preceding counts, they are based, alternately, on § 1983 and Title VII.

Counts VII and VIII are also directed at Stone, Benjamin, Reynolds, and the State. The former count is based on the Rhode Island State Labor Relations Act (R.I.Gen. Laws §§ 28–7–1 et seq.) and asserts that the defendants interfered with the "Plaintiffs'" organizational and collective bargaining rights under that statute. The latter count consists of a number of state tort law claims asserted by Trooper Nunes for assault and battery, intentional infliction of emotional distress, and invasion of privacy both during and after the 1985/86 Training Academy.

This potpourri of claims, claimants, and defendants was gradually reduced as the litigation proceeded through its various stages. The winnowing process began on October 16, 1986 when Judge Selya granted Trooper Bailey's motion to dismiss her claims with prejudice. More chaff was eliminated on August 25, 1988 when this Court granted Attorney General Violet's motion for judgment on the pleadings with respect to Counts III and IV and granted the motions of Defendants Stone, Benjamin, Reynolds, and State to dismiss Count VII and to dismiss Count VIII as to all "Plaintiffs" but Nunes.

Subsequently, Nunes' claims and those of the remaining "Plaintiffs" were severed for purposes of trial, and the former were bifurcated as to liability and damages. The liability portion of Nunes' case was tried in September of 1988 and resulted in a jury verdict finding Reynolds liable under Count III and finding Stone, Benjamin, and the State liable under Count V and the invasion of privacy portion of Count VIII. That verdict also found in favor of Reynolds on Counts V and VIII and in favor of Stone, Benjamin and the State on Count III and the remaining portions of Count VIII.

Shortly thereafter, all "Plaintiffs", other than Nunes, dismissed, with prejudice, all of their claims accruing prior to June 16, 1986, the date on which suit was commenced. In exchange, the defendants released those "Plaintiffs" from any claims arising as a result of the suit except claims for attorneys' fees pursuant to 42 U.S.C. § 1988.

The damages portion of Nunes case then proceeded to trial and resulted in a jury verdict awarding only nominal damages against Reynolds and the State and both nominal and punitive damages against Stone and Benjamin. Subsequent to that verdict (i.e., November 21, 1988), this Court, having previously reserved ruling on

several motions for directed verdicts, granted those made by Reynolds with respect to Count III and by Stone, Benjamin and the State with respect to Count VIII. The latters' motions for directed verdicts with respect to Count V were, simultaneously, denied. The Court also entered judgment for the defendants on Counts I and II inasmuch as the only "Plaintiffs" with standing to prosecute those counts had dismissed all of their claims, with prejudice.[1] Finally, the Court entered judgment for the defendants on Counts IV and VI (i.e., Nunes' Title VII claims), and denied "Plaintiffs'" requests for declaratory and injunctive relief.

The final step in the winnowing process occurred on December 22, 1988 when the Court granted motions by Stone and Benjamin for new trials unless Nunes consented to a remittitur of a portion of the punitive damages awarded. An acceptance of that remittitur was later filed but not without some controversy as to whether the document filed by "Plaintiffs'" counsel constituted a valid acceptance. *See,* Memorandum and Order (February 2, 1989).

The net result was that, on February 2, 1989, final judgment was entered in favor of all defendants on Counts I–IV and VI–VIII. With respect to Count V, final judgment was entered for Defendants Reynolds and Violet and for "Plaintiff" Nunes against Defendants Stone, Benjamin, and Rhode Island for nominal damages in the amount of $2.00 each and for punitive damages of $10,000 against Stone and $5,000 against Benjamin.

On February 6, 1989, well within the 30–day period prescribed by Fed.R.App.P. 4(a)(1), "Plaintiffs'" counsel filed a notice of appeal stating that "Plaintiffs in the above-entitled action hereby appeal to the United States Court of Appeals for the First Circuit". Apparently recognizing that the notice did not "designate the judgment, order or part thereof appealed from" as required by Fed.R.App.P. 3(c),[2] "Plaintiffs'" counsel promptly filed an "amended notice of appeal" identifying the judgment appealed from as that entered on February 2, 1989.

On March 28, 1989, after expiration of the 30–day period, the Court of Appeals issued its show cause order indicating that the amended notice of appeal failed to meet another of the three requirements set forth in Rule 3(c) in that it did not identify the party or parties taking the appeal. As previously stated, that order precipitated the instant motion.

## LEGAL STANDARD

Fed.R.App.P. 4(a)(5) permits the District Court to extend the time for filing a notice of appeal only "... upon a showing of excusable neglect or good cause." The use of the disjunctive "or" makes it clear that excusable neglect and good cause are not necessarily synonymous.[3] That conclusion is buttressed by the well-established distinction between the excusable neglect required to remove a default judgment under Fed.R.Civ.P. 60(b)(1) and the good cause sufficient to set aside a default under Fed. R.Civ.P. 55(c).

The exact nature of the distinction is obscured by the fact that there is no litmus test for ascertaining when excusable neglect or good cause exists. Those determinations are not made through the application of precise formulas. Rather, they require the court to identify, weigh and balance the unique factors present in each

---

1. Nunes could not assert any claims under Counts I or II because she was not a member of the State Police prior to the 1985/1986 Training Academy and presented no evidence that she was personally affected by any alleged discrimination during that period.

2. Fed.R.App.P. 3(c) sets forth three requirements that must be satisfied by a notice of appeal. They are that the notice must:
 (1) specify the party or parties taking the appeal;

 (2) designate the judgment, order or part thereof appealed from; and
 (3) name the court to which the appeal is taken.

3. The defendants' argument that the good cause standard does not apply to motions filed after the expiration of the appeal period was rejected in *Scarma v. Murphy,* 782 F.2d 300 (1st Cir. 1986).

case. The difference between the two standards resides, primarily, in the relative emphasis placed on those factors and the stringency with which they are applied. Thus, generally speaking, good cause is viewed as a broader and more liberal standard that frees the Court from some of the restraints imposed by the excusable neglect requirement and affords it greater discretion in determining whether to grant relief. This more flexible approach reflects a policy decision that a default *judgment* should enjoy a greater degree of finality and, therefore, should be more difficult to disturb than a mere default. *See,* 10 Wright, Miller & Kane, *Federal Practice and Procedure,* §§ 2692, at 469–71, and 2694 (2d ed. 1983).

However, that does not mean that good cause is so devoid of substance as to constitute carte blanche for disregarding the rules. Moreover, despite their differences, both standards require presentation of a good excuse or explanation for the default and both involve consideration of the same litany of additional factors that make up the rest of the equation. Those factors may include whether the default was willful, whether the defaulting party presents a meritorious case, the extent to which granting relief would prejudice the non-defaulting party, the good faith of the parties, the stakes involved and the timing of the request. *See,* 10 Wright, Miller & Kane, *Federal Practice and Procedure,* §§ 2692, at 469–71, and 2694 (2d ed. 1983). *See also, Coon v. Grenier,* 867 F.2d 73, 76 (1st Cir.1989).

The policies counselling liberality in assessing those factors are somewhat less compelling in the context of Fed.R.App.P. 4(a)(5) than they are with respect to Fed.R. Civ.P. 55(c) or 60(b)(1). In all three cases, determining whether excusable neglect or good cause exists requires the court to balance the need to uphold its rules and prevent the chaos that would result if they could be disregarded without fear of the consequences against the desire to give the defaulting party a reasonable opportunity to litigate his or her claims on their merits. In striking that balance, legitimate doubts should be resolved in favor of allowing the defaulting party to have his or her day in court. However, in the case of an appeal, unlike that of a default or default judgment, the party seeking relief has already had one day in court. Thus, in determining whether there has been a sufficient showing of excusable neglect to allow an extension of the prescribed time during which an appeal may be taken, it has been held that excusable neglect should be found only in "unique and extraordinary circumstances" and requires more than a mere "oversight" or "palpable mistake" on the part of counsel in failing to file a timely notice of appeal. *Spound v. Mohasco Indus.,* 534 F.2d 404, 411 (1st Cir.) *cert. denied,* 429 U.S. 886, 97 S.Ct. 238, 50 L.Ed.2d 167, *reh. denied,* 429 U.S. 988, 97 S.Ct. 513, 50 L.Ed. 2d 601 (1976); *Chipperfield v. Posi–Seal Int'l,* 550 F.Supp. 1322, 1323 (D.R.I.1982). *See, United States v. Ferrer,* 613 F.2d 1188, 1190–91 (1st Cir.1980).

■ While there is a dearth of case law discussing good cause in the context of Rule 4(a)(5), it is clear, from the foregoing, that one seeking an extension of time pursuant to that rule, under either that standard or that of excusable neglect, must clear two hurdles. First, the movant must present a good reason excusing or explaining the failure to file a valid notice of appeal within the prescribed time. Second, the movant must present countervailing factors sufficient to warrant overlooking the failure. The nature of the showing required will depend upon the nature of the reason, how compelling the factors are and the standard being applied.

## DISCUSSION

In this case, it is particularly difficult to determine whether good cause and/or excusable neglect exist because the "Plaintiffs" advance several vague and inconsistent arguments. The gist of those arguments is as follows:

1. The Amended Notice of Appeal is not deficient because it *does* "specify the party or parties taking the appeal."

2. The failure to specifically name the party or parties taking the appeal constitutes

excusable neglect because the amended notice of appeal was filed before *Gonzalez–Vega v. Hernandez–Colon*, 866 F.2d 519 (1st Cir.1989) in which such a requirement was first enunciated.

3. Good cause exists for granting an extension of time in which to permit the "Plaintiffs" to correct their error by filing a new notice of appeal specifically naming the party or parties taking the appeal.

Those arguments will be considered, in turn.

*Sufficiency of the Amended Notice of Appeal*

■ In both their memo and their oral argument, the "Plaintiffs" have studiously avoided acknowledging that their amended notice of appeal erroneously failed to "specify the party or parties taking the appeal" as required by Fed.R.App.P. 3(c). Instead, counsel has insisted that, by filing the motion on behalf of the "Plaintiffs", she intended that term "to be inclusive of *all* Plaintiffs" [emphasis added], thereby suggesting that the classes of "all Plaintiffs" and those "parties taking the appeal" were one and the same.

This Court finds that argument to be disingenuous, at best. It has already been noted that the "Plaintiffs" in this case were Rhode Island State Police Lodge 25, FOP, several of its male officers and two of its female members (to wit: Linda Bailey and Mary Nunes). As previously stated, all of the "Plaintiffs" except Mary Nunes voluntarily agreed, on the record, to dismiss all of their claims with prejudice. Consequently, none of the "Plaintiffs," except Mary Nunes, have any basis for appealing.

When confronted with that fact during oral argument, "Plaintiffs" contended that the agreement by the Lodge and its members to dismiss their claims did not extend to those claims contained in Counts III, IV, VII and VIII which had previously been disposed of via motions to dismiss and for judgment on the pleadings. Such a contention is flatly contradicted by the express terms of the dismissal agreement of October 28, 1988 to which "Plaintiffs", through their counsel, were parties. The transcript of the proceedings during which that agreement was reached clearly recites that:

"... the remaining plaintiffs [the Lodge and its male officers] hereby dismiss with prejudice *all* claims that they may have against these defendants that occurred prior to the date on which this suit was filed, namely June 16, 1986." Transcript, at p. 8.

Even if the "Plaintiffs" could make a plausible good faith argument that the appeal should be considered as having been filed on behalf of "all Plaintiffs," the sufficiency of the amended notice of appeal would have no bearing on the issue before this Court. Whether a notice of appeal satisfies the requirements of the Rules of Appellate Procedure is a matter for the Court of Appeals to decide. The function of this Court is merely to determine whether a sufficient showing of excusable neglect or good cause has been made to warrant an extension of time in which to correct a defective notice.

*Excusable Neglect*

■ While "Plaintiffs" carefully refrain from using the term "excusable neglect," they tacitly seek relief on that ground by suggesting that their failure to specifically name the appellants was due to the fact that their amended notice of appeal was filed before the First Circuit's decision in *Gonzalez–Vega*, *supra*. There, the Court dismissed that portion of an appeal purportedly taken on behalf of a number of plaintiffs (other than Alfredo Gonzalez–Vega) because the notice of appeal listed the appellant(s) only as Alfredo Gonzalez–Vega, *et al.* and failed to name any of the other putative appellants.

In alluding to *Gonzalez*, the "Plaintiffs" obviously intend to imply that, until that case was decided, there was no clear pronouncement that a notice of appeal must specifically name the party or parties taking the appeal. This Court finds both the factual and legal premises of that argument to be incorrect. In the first place, the amended notice of appeal in this case was filed four days *after Gonzalez* was decided,

not *before,* as the "Plaintiffs" represent.[4]

Nevertheless, if that was the only fly in the "Plaintiffs'" ointment, it would not prevent this Court from finding excusable neglect, or even justification, for the omission. It would be patently unreasonable to expect counsel to be familiar with appellate decisions within such a short period after their issuance. The demands of busy trial schedules make it impossible for both attorneys and trial courts, alike, to review opinions of higher courts with such alacrity. Thus, the Court can easily understand and excuse the fact that counsel, in this case, was unaware of *Gonzalez* at the time the amended notice of appeal was filed.

The more conspicuous flaw in the "Plaintiffs'" argument is that, contrary to their insinuations, the requirement that a notice of appeal specifically name the party or parties taking the appeal did not originate with *Gonzalez.* It was enunciated as early as June 24, 1988 by no less an authority than the United States Supreme Court in *Torres v. Oakland Scavenger Co.,* — U.S. ——, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988). There, the Court held that, in a case involving multiple plaintiffs, a notice of appeal omitting the name of one of those "Plaintiffs" failed to meet the requirements of Rule 3(c) and deprived the Court of Appeals of jurisdiction to hear that plaintiff's appeal. It noted that:

> "The purpose of the specificity requirement of Rule 3(c) is to provide notice both to the opposition and to the Court of the identity of the appellant or appellants. The use of the phrase 'et al.,' which literally means "and others," utterly fails to provide such notice to either intended recipient. Permitting such vague designation would leave the appellee and the Court unable to determine with certitude whether a losing party not named in the notice of appeal should be bound by an adverse judgment or held liable for costs or sanctions."

*Torres,* 108 S.Ct. at 2409.

That requirement was made even more explicit by the First Circuit in *Santos–Mar-*

*tinez v. Soto–Santiago,* 863 F.2d 174 (1st Cir.1988), which was decided on December 19, 1988 and which involves facts remarkably similar to those in this case. In *Santos,* a group of plaintiffs, against whom summary judgments had been entered, filed a notice of appeal. The caption of the notice identified the plaintiff only as Angel David Santos–Martinez, *et al.* and the text stated "all plaintiffs appeal". The Court noted that, although there were initially eight "Plaintiffs," only five were mentioned in appellant's brief. Counsel partially explained the discrepancy by informing the Court that two of the plaintiffs (including Santos–Martinez) had voluntarily withdrawn in the District Court. In any event, the Court dismissed the appeal of the remaining "Plaintiffs" on the ground that the failure to name them in the notice of appeal violated the specificity requirement of Rule 3(c). In so doing, it specifically rejected many of the arguments made by the "Plaintiffs" in *this* case, saying:

> [A]ppellants argue that their case is distinguished from *Torres* by the statement in the notice of appeal that *"All* plaintiffs appeal...." (Emphasis added.) But most of the Supreme Court's reasoning for rejecting the "et al." designation applies equally in the circumstances of this case to the words, "All plaintiffs." We know, in fact, that fewer than all plaintiffs were appealing, and there was no way that the appellees and the court could tell with certitude who the actual appellants were.... The *Torres* Court held that it was precisely in order to avoid such ambiguity that Rule 3(c) requires that a notice of appeal "shall specify the party or parties taking the appeal." Litigants should name each appellant rather than relying on vague, generic references. In the words of Hamlet, at the close of Act 1, Scene 2, *"All* is not well" (emphasis added).

Appellants suggest that despite their failure to identify specifically those plain-

---

**4.** *Gonzalez* was decided on February 2, 1989. Both the original and amended notices of ap-

peal were filed on February 6, 1989.

tiffs who were appealing, "there is no lack of clarity in the manifested purpose of all plaintiffs, including the three remaining appellants, to seek review." But the purpose of all plaintiffs to seek review was anything but manifest. Plainly the two plaintiffs who had earlier withdrawn from the case had neither the purpose nor the standing to seek review. That the appellees and the court might, by further inquiry, eventually ascertain the identity of the actual appellants is not enough, as the *Torres* Court has indicated in its near-unanimous decision. Appellants must comply with the language of Rule 3(c)—that is, they must "specify the party or parties taking the appeal." It does not suffice that the actual appellants are now known and that no harm may have been done by reason of the insufficient notice of appeal. Because Rule 3(c) is jurisdictional, the Supreme Court has stated that "harmless error" analysis is inapplicable to a defect in the notice of appeal: "a litigant's failure to clear a jurisdictional hurdle can never be 'harmless' or waived by the court."

*Santos–Martinez,* 863 F.2d at 176–77.

Since *Torres* and *Santos* were both decided months before the notices of appeal were filed in this case, it is difficult to see any good excuse or explanation for not complying with their requirements. Indeed, "Plaintiffs" have not even tendered such an excuse or explanation. Instead, the have sought to distinguish *Torres* and *Santos* from the instant case, a feat that would be akin to fitting a square peg into a round hole. To put it bluntly, while there may have been neglect in this case, it does not appear to be excusable.

*Good Cause*

 The last salvo in the "Plaintiffs'" broadside of arguments is that good cause exists to permit them to file a new notice of appeal specifically naming Alvin T. Pontarelli, Mary M. Nunes, Raymond Ellis, Rhode Island State Police Lodge 25, Fraternal Order of Police, Edward Pendergast and Ronald Lepre as the appellants. However, that argument misses the mark for several reasons.

As previously noted, good cause requires a dual showing. The defaulting party must present a reason for the default that is good enough to excuse or satisfactorily explain it. In addition, the defaulting party must convince the court that the interests of justice would be served by overlooking the default. In this case, the "Plaintiffs'" showing falls short on both counts. The failure to present a good reason for the default has already been discussed. Moreover, it is matched by a failure to establish sufficiently compelling reasons for overlooking the default.

The "Plaintiffs" present two reasons that they contend warrant overlooking their default. One is the absence of any indication that the defendants would be unduly prejudiced by allowing a new notice of appeal to be filed. Specifically, "Plaintiffs" point to the fact that their intention to take some sort of an appeal was expressed in a timely fashion by filing the original and amended notices of appeal and that they filed the instant motion within a relatively short period of time, thereafter. While this is certainly a legitimate factor in the "Plaintiffs'" favor, it represents only one element in the good cause equation. Consequently, it must be weighed with the other factors on the "Plaintiffs'" side of the scale and balanced against those on the other side.

The second reason the "Plaintiffs" present for overlooking their default takes the form of an assertion that the abortive appeal has merit. However, in describing what it is that "they" seek to appeal from and why that appeal is meritorious, they claim only that "... two other decisions of the First Circuit, announced after this Court's finding for Defendants on Title VII issues clearly established the entitlement of Plaintiff Nunes to judgment on her Title VII claims." Those decisions are identified as *Santiago–Negron v. Castro–Davila,* 865 F.2d 431 (1st Cir.1989) and *Perez–Serrano v. DeLeon–Velez,* 868 F.2d 30 (1st Cir.1989) and are cited for the proposition that, in deciding a Title VII claim, the Court must

defer to factual determinations made by a jury with respect to § 1983 claims.

This assertion suffers from two infirmities. A careful reading of *Santiago–Negron* and *Perez–Serrano* indicates that they hold no such thing. In *Santiago–Negron*, the First Circuit held that "in a [42 U.S.C.] § 1983 case based upon an alleged unconstitutional political firing where the issues of liability and compensatory damages will be determined by a jury, back pay shall be considered by the jury as one of the items of compensatory damages." 865 F.2d at 441. Similarly, in *Perez–Serrano*, which was also a political affiliation-discharge case, the First Circuit held that "[w]here a plaintiff seeks both damages and injunctive relief under § 1983, the jury must assess liability as well as damages." 868 F.2d at 34. None of the plaintiffs in either case appear to have alleged a violation of Title VII and the Court of Appeals nowhere addresses whether a trial court, when deciding a Title VII claim, must defer to a jury's prior determination of facts with respect to § 1983 claims.

Nevertheless, "Plaintiffs'" mischaracterization of the holdings in *Perez–Serrano* and *Santiago–Negron* are not dispositive of the question as to whether the proposed appeal is meritorious. This Court recognizes that the issue raised is a fairly debatable one and that a prospective appeal regarding such an issue should not be denominated as meritless merely because the Court feels that the appeal is unlikely to succeed.

However, even if there is merit in the "Plaintiffs'" position with respect to the point of law at issue, it is outweighed by the futility of allowing them to file the "new" notice of appeal that they propose. First of all, assuming *arguendo*, that the portion of the judgment denying Nunes relief with respect to her Title VII claims

were reversed, the net result would be virtually unchanged. As previously noted, the disposition of those claims, which are contained in Counts IV and VI, accounts for only a small portion of the judgment. Moreover, there has already been a jury determination of the identical claims which were also asserted in Counts III and V under the aegis of § 1983.[5] Thus, even if the Court were required to accept the jury's factual findings with respect to those counts, the outcome would be no different inasmuch as those findings include the amount of damages to which Nunes was entitled and this Court has already stated that it would not be inclined to award any additional relief.[6] Transcript of November 21, 1988, at p. 6.

An even more fundamental reason why allowing the "Plaintiffs" to file their proposed "new" notice of appeal would be an exercise in futility is the form of that notice itself. In their motion and accompanying memorandum, and during the course of oral argument, "Plaintiffs" have made it clear that their "new" notice of appeal would make no change other than to "specifically name the appellants in the body of the notice of appeal." They adamantly maintain that their sole purpose is to explicitly state what they say was their original intent, namely, to file an appeal on behalf of "all plaintiffs". However, as previously noted, some of the "Plaintiffs" are no longer parties to this case. In addition, the only one who still is a party (i.e. Mary Nunes) clearly cannot appeal the judgment with respect to Counts I, II or V and could appeal only limited portions of the judgments regarding the remaining counts. Consequently, a new notice of appeal in the form proposed by "Plaintiffs" would fail to satisfy the third requirement of Fed.R. App.P. 3(c) that:

**5.** Since Nunes accepted a remittitur in connection with her claims, under Count V, for monetary relief against Stone, Benjamin and the State, she is precluded from appealing that portion of the judgment. *Donovan v. Penn Shipping Co., Inc.*, 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977). *See*, 11 Wright, Miller & Elliott, *Federal Practice and Procedure* § 2815 n. 13.1 (2d ed. 1983). Consequently, it is doubtful

that she may pursue such an appeal indirectly via the companion Title VII count (i.e., Count VI).

**6.** However, the disposition of Nunes' claims under Counts IV and VI might affect determination of the claims for attorneys' fees in connection with those claims.

"The notice of appeal ... shall designate the judgment, order *or part thereof* appealed from ..." [emphasis added].

In short, granting "Plaintiffs'" motion would result in nothing more than another round trip to the Court of Appeals.

## CONCLUSION

The "Plaintiffs" have not presented any reason that would excuse or explain their failure to timely file a valid notice of appeal. In addition, they have not made a sufficient showing as to why that failure should be overlooked. Therefore, they have demonstrated neither excusable neglect nor good cause as required by Fed.R. App.P. 4(a)(5). Their motion for an extension of time is, accordingly, denied.

IT IS SO ORDERED.