Trooper Alvin T. **PONTARELLI**, et al.

v.

Walter E. **STONE**, et al.

Civ. A. No. 86–0370–T.

United States District Court,
D. Rhode Island.

Jan. 16, 1992.

As Corrected Jan. 21, 1992.

116

Ina P. Schiff, Providence, R.I., Joseph J. Levin, Jr., Carla Calobrisi, Adams, McCullough & Beard, Washington, D.C., for plaintiffs.

Max Wistow, Wistow & Barylick, Inc., Thomas J. McAndrew, Providence, R.I., for defendants Stone & Benjamin.

Joseph V. Cavanagh, Jr., Blish & Cavanagh, Providence, R.I., for defendant Reynolds.

James E. O'Neil, Atty. Gen., Robert E. Feder, Asst. Atty. Gen., Providence, R.I., for defendants Atty. Gen. Violet and State of R.I.

## MEMORANDUM AND ORDER

TORRES, District Judge.

This case is before the Court on cross motions for awards of attorneys' fees and costs pursuant to 42 U.S.C. § 1988. The principal issues presented are whether the plaintiffs are "prevailing" parties, whether they have presented documentation sufficient to support their requests and whether

the claims unsuccessfully asserted against some of the defendants can be characterized as frivolous or brought in bad faith.

## BACKGROUND

### I. *Travel of the Case*

The procedural history of this case is lengthy and complex. It has been chronicled in previously reported decisions dealing with other phases of this litigation.[1] However, a brief summary is required to place the instant motions in context.

This litigation was initiated by an eight count complaint filed on behalf of Rhode Island State Police Lodge 25, FOP (the "Lodge"), three of its male officers and two of its female members, Linda Bailey and Mary Nunes. Trooper Nunes became a member of the Rhode Island State Police after successfully completing the 1985–1986 Training Academy for new recruits. The other individual plaintiffs became members before that time. The defendants were Colonel Walter E. Stone and Major Lionel Benjamin, the superintendent and executive officer, respectively, of the Rhode Island State Police; Lieutenant Walter T. Reynolds, the officer charged with responsibility for conducting the 1985–1986 Training Academy; Arlene Violet, the Attorney General of the State of Rhode Island during the time the 1985–1986 Training Academy was being conducted and the State of Rhode Island.

Counts I and II were directed at Stone, Benjamin and the State. They alleged a continuing practice of sex discrimination in violation of 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, respectively, during an unspecified period of time prior to the 1985–1986 Training Academy. Counts III and IV contained similar allegations against all five defendants and relate to the manner in which the Training Academy was conducted. Counts V and VI charged sex discrimination and retaliation by Stone, Benjamin, Reynolds and the State during the period between the conclusion of the

Training Academy and the filing of the complaint. Like the preceding counts, they were based on § 1983 and Title VII, respectively.

Counts VII and VIII were also directed at Stone, Benjamin, Reynolds and the State. Count VII alleged violations of the plaintiffs' organizational and collective bargaining rights under the Rhode Island Labor Relations Act, R.I.Gen.Laws §§ 28–7–1 *et seq.* Count VIII consisted of several state tort law claims asserted by Nunes for assault and battery, intentional infliction of emotional distress and invasion of privacy both during and after the 1985–1986 Training Academy.

On October 16, 1986, Bailey voluntarily dismissed her claims with prejudice. On August 25, 1988, this Court granted Violet's motion for judgment on the pleadings with respect to Counts III and IV thereby eliminating her from the case.

Subsequently, Nunes' claims and those of the remaining plaintiffs were severed for purposes of trial, and Nunes' claims were bifurcated as to liability and damages because it appeared that a considerable amount of medical and/or psychiatric evidence would be required in connection with her claim for damages. The liability portion of Nunes' case that consisted of claims requiring a jury trial (i.e., Counts III, V and VIII) was tried in September and October of 1988. The jury found Reynolds liable under Count III (sex discrimination/harassment during the Training Academy) and found Stone, Benjamin and the State liable under both Count V (sex discrimination/harassment for the period after the Training Academy) and the invasion of privacy claim contained in Count VIII. The jury also found in favor of Reynolds on Counts V and VIII and in favor of Stone, Benjamin and the State on both Count III and the assault and battery and intentional infliction of emotional distress claims contained in Count VIII.

---

1. *Pontarelli v. Stone,* 713 F.Supp. 525 (D.R.I. 1989); *Pontarelli v. Stone,* 930 F.2d 104 (1st Cir.1991).

The day after that verdict was returned all of the remaining plaintiffs, except Nunes, dismissed their claims with prejudice. In exchange, the defendants released those plaintiffs from any claims arising out of the suit other than claims for attorneys' fees pursuant to 42 U.S.C. § 1988.

The damages portion of Nunes' case then proceeded to trial and resulted in a jury verdict awarding only nominal damages against Reynolds and the State, but both nominal and punitive damages against Stone and Benjamin in the amounts of $75,-000.00 and $50,000.00, respectively. Subsequently, this Court, having previously reserved ruling on the defendants' motions for directed verdicts, granted Reynolds' motion with respect to Count III and the motions by Stone, Benjamin and the State with respect to Count VIII. Similar motions by Stone, Benjamin and the State were denied with regard to Count V. At the same time, the Court also entered judgment for the defendants on Counts I and II since the only plaintiffs with standing to prosecute those counts had dismissed their claims with prejudice.[2] Finally, the Court entered judgment for the defendants on Counts IV and VI (the Title VII claims) and denied plaintiffs' requests for declaratory and injunctive relief.

The final chapter of the trial phase of this case was written on December 22, 1988, when this Court granted a motion by Stone and Benjamin for a new trial unless Nunes consented to a remittitur of a portion of the punitive damages awarded. Nunes consented to the remittitur, and the net result was entry of a final judgment in favor of all defendants on Counts I–IV and VI–VIII. With respect to Count V, final judgment was entered for Reynolds and Violet but in favor of Nunes against Stone, Benjamin and the State for nominal damages in the amount of $2.00 each and for punitive damages against Stone and Benjamin in the amounts of $10,000.00 and $5,000.00, respectively. The "plaintiffs" and defendants all appealed, and at the request of the parties, this Court deferred

the lengthy process of making attorneys' fee awards until those appeals were resolved thereby establishing with finality which parties had "prevailed."

The First Circuit affirmed this Court's judgment with one modification. Based on the Supreme Court's intervening decision in *Will v. Michigan Department of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), it dismissed the claims against the State on the ground that the State is not a "person" subject to suit under 42 U.S.C. § 1983. In all other respects, the judgment was affirmed. *Pontarelli v. Stone*, 930 F.2d 104, 113 (1st Cir.1991).

## II. *Attorneys' Fees Petitions*

As soon as the judgment became "final," the battle over attorneys' fees and costs began in earnest. Plaintiffs, through their chief counsel, Ina P. Schiff, moved, pursuant to 42 U.S.C. § 1988, for an award of $511,951.00 in attorneys' fees and $203,-268.28 in costs. However, no supporting documentation was submitted until nearly two months after the due date fixed by the Court. Most of the attorneys' fees sought by the plaintiffs are attributable to time claimed to have been devoted to the case by Ms. Schiff. The remainder is attributable to hours logged by attorneys in a North Carolina law firm who served as trial counsel and a Rhode Island attorney who was co-counsel with Ms. Schiff at the inception of the case but withdrew shortly thereafter.

Violet and Reynolds petitioned for fees in the amounts of $54,168.50 and $198,127.46, respectively. Since the State paid Reynolds' legal expenses, it joined in his request. However, the State does not seek any fees for its own defense because it candidly acknowledges that, although it was represented by counsel at all stages, its interests were served by counsel for the other defendants who wielded the laboring oars.

---

**2.** Nunes could not assert any claims under Counts I or II because she was not a member of the State Police prior to the 1985–1986 Training Academy and presented no evidence that she was personally affected by any alleged discrimination during that period.

The volume of documents involved, the number of issues raised and the contentiousness of the parties required this Court to conduct hearings on six different dates. The time span was further lengthened when the proceedings were reopened to permit the defendants to present newly discovered evidence with respect to allegations that Ms. Schiff had falsified an affidavit regarding the fees she customarily charged other clients and that certain expenses she claimed were unrelated to this case.

## DISCUSSION

### I. *Plaintiffs' Entitlement to Attorneys' Fees*

#### A. The Prevailing Party Requirement

The general rule is that a "prevailing" party ordinarily is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988 unless "special circumstances would render such an award unjust." *Blanchard v. Bergeron*, 489 U.S. 87, 89 n. 1, 109 S.Ct. 939, 942 n. 1, 103 L.Ed.2d 67 (1989) (citing *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968)).[3] Therefore, in passing on a petition for attorneys' fees, the Court must begin by determining whether the petitioner "prevailed."

Plaintiffs are said to "prevail" when they "succeed on any significant issue in litigation which achieves some of the benefit [they] sought in bringing the suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir.1978)). That benefit need not be achieved through a formal judgment. A plaintiff may be deemed a prevailing party if its law suit prompted the defendant to provide the relief sought under the aegis of a settlement or otherwise. *Nadeau*, 581 F.2d at 279. In either event, what is required is more than a

purely technical or *de minimis* victory. A "plaintiff must be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant." *Texas State Teachers Ass'n v. Garland Indep. School Dist.*, 489 U.S. 782, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 (1989).

When a case is actually litigated and a plaintiff does not win on any significant issue, that plaintiff is not a prevailing party within the meaning of § 1988. *Pearson v. Fair*, 935 F.2d 401, 415 (1st Cir.1991) (citing *Langton v. Johnston*, 928 F.2d 1206, 1224 (1st Cir.1991)). Obviously, dismissal of a plaintiff's claim prior to trial prevents that plaintiff from being deemed a prevailing party. *See Perkins v. Cross*, 728 F.2d 1099, 1100 (8th Cir.1984); *Jordan v. Dorsey*, 587 F.Supp. 282, 287 (E.D.Pa. 1984). The fact that the dismissal is voluntary does not change the result, at least where there is no *quid pro quo* concession by the defendant. *See Zabkowicz v. West Bend Co.*, 789 F.2d 540, 552 (7th Cir.1986).

In this case, it is clear that Nunes is the only plaintiff who can claim to be a prevailing party. The other plaintiffs did not achieve any of the benefits they sought. Their claims were either dismissed unconditionally or resulted in judgments in favor of the defendants. It is equally clear that the only defendants that Nunes can claim to have prevailed against are Stone and Benjamin because they are the only ones against whom she obtained judgments.

Stone and Benjamin argue that Nunes did not "prevail" against them. Although they acknowledge Nunes' success on Count V, they point out that judgment was entered in their favor as to the remaining counts. That observation is inapposite. As already noted, a plaintiff need not achieve total victory in order to be deemed a "prevailing" party. All that is required

---

**3.** Title 42 U.S.C. § 1988, provides in pertinent part:

> In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318 [20 U.S.C. 1681 et seq.], or title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

is success on a significant issue that achieves an appreciable measure of the relief sought. *Nadeau*, 581 F.2d at 278–79. Thus, when a plaintiff asserts multiple claims but does not succeed on all of them, the relevant inquiry in determining whether that plaintiff "prevailed" is whether the claims successfully asserted accomplished a significant purpose.

In this case, the Court finds that Nunes did succeed on a significant issue and achieved an appreciable measure of the relief sought against Stone and Benjamin. She obtained a judgment finding them liable for sex discrimination and awarding her punitive damages. Consequently, she is a "prevailing" party within the meaning of § 1988 even though she failed on her other claims.

### B. The Reasonableness and Documentation Requirements

■ As already noted, a prevailing party ordinarily is entitled to an award of attorneys' fees under § 1988 unless "special circumstances" exist that "would render such an award unjust." *Newman v. Piggie Park Enterprises*, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968). However, prevailing party status alone is not sufficient to support an award of attorneys' fees. In order to recover attorneys' fees from an adversary, a prevailing party must carry the burden of establishing that the amounts sought are "reasonable." *Hensley*, 461 U.S. at 433–34, 103 S.Ct. at 1939.

The starting point or "lodestar" for determining the reasonableness of a fee is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939. Therefore, a fee application must be accompanied by documentation that is:

> sufficient to satisfy the court, or indeed a client, that the hours expended were actual, nonduplicative and reasonable, ... and to apprise the court of the nature of the activity and the claim on which the hours were spent.

*Ackerman v. Western Elec. Co., Inc.*, 643 F.Supp. 836, 862 (N.D.Cal.1986), *aff'd*, 860 F.2d 1514 (9th Cir.1988) (citations omitted).

■ Such documentation is particularly important where the "prevailing" plaintiff does not succeed on all of the claims asserted. In such "mixed success" cases, hours spent on unsuccessful claims must be excluded from fee computations if those claims are separate and distinct from the successful claims, and the fee awarded should be limited to that which is reasonable in relation to the result achieved. *Hensley*, 461 U.S. at 434–35, 440, 103 S.Ct. at 1939–40, 1943; *Nadeau*, 581 F.2d at 279.

■ Furthermore, regardless of the degree of success, "prevailing" parties are not entitled to awards for hours that are duplicative, unproductive, excessive or unnecessary. *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1939–40. Since such time is "not properly billed to one's *client* [it is] not properly billed to one's *adversary* pursuant to statutory authority." *Copeland v. Marshall*, 641 F.2d 880, 891 (D.C.Cir.1980) (en banc) (emphasis in original).

■ In order to ensure that the information presented is reliable and sufficiently detailed so that the reasonableness of the fee claimed may be challenged by the adversary and evaluated by the court, the First Circuit has prescribed certain criteria that must be adhered to in documenting fee requests under § 1988. Specifically, it requires that fee petitions be accompanied by contemporaneous time records reflecting the nature of the task performed and who performed it. *Grendel's Den v. Larkin*, 749 F.2d 945, 951–52 (1st Cir.1984); *Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939.

Such records must be adequate to permit an allocation of time among successful claims and separate claims that were unsuccessful. *Hensley*, 461 U.S. at 434–35, 103 S.Ct. at 1939–40; *Nadeau*, 581 F.2d at 279; *see Culebras Enter. Corp. v. Rivera-Rios*, 846 F.2d 94, 102 (1st Cir.1988). Furthermore, when multiple plaintiffs are involved, the records must provide a basis for apportioning the hours devoted to the claims of those who succeeded and the hours spent on the claims of those who did

not. *Nadeau,* 581 F.2d at 278–79 (discussing cases in which some but not all plaintiffs obtain relief); *see Perkins v. Cross,* 728 F.2d 1099, 1100 (8th Cir.1984). In addition, when more than one attorney represents a plaintiff, the records must contain a "convincing description of the division of labor" so that it can be determined whether and to what extent the efforts of various counsel were duplicative. *See Furtado v. Bishop,* 635 F.2d 915, 922 (1st Cir.1980).

Failure to comply with these requirements is a basis for drastically reducing or, in extreme cases, completely disallowing an award of attorneys' fees. Thus, the First Circuit has said:

> henceforth, in cases involving fee applications for services rendered after the date of this opinion, the absence of detailed contemporaneous time records, except in extraordinary circumstances, will call for a substantial reduction in any award or, *in egregious cases,* disallowance.

*Grendel's Den,* 749 F.2d at 952 (emphasis added); *see also Nat'l Ass'n of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1331 n. 19 (D.C.Cir.1982) ("Where a fee submission is manifestly inadequate, the District Court has no obligation to proceed further and denial is appropriate.").

▆▆▆ In addition, total disallowance may be justified "when the application is grossly and intolerably exaggerated, or manifestly filed in bad faith." *Jordan v. United States Dep't of Justice,* 691 F.2d 514, 518 (D.C.Cir.1982) (footnotes omitted). Thus, the lack of a good faith effort to eliminate time expended on separate unsuccessful claims or on behalf of unsuccessful litigants or to exclude hours which are "excessive, redundant, or otherwise unnecessary" may constitute the kind of special circumstance that warrants complete denial of a fee request. *Lewis v. Kendrick,* 944 F.2d 949, 957 (1st Cir.1991) (quoting *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939–40). In *Lewis,* the court cited, with approval, a Seventh Circuit decision that denied a fee award even though there was a recovery saying:

If, as appellant argues, the Court were required to award a reasonable fee when an · outrageously unreasonable one has been asked for, claimants would be encouraged to make unreasonable demands, knowing that the only unfavorable consequence of such misconduct would be reduction of their fee to what they should have asked for in the first place.... A request for attorney's fees is required to be in good faith and in reasonable compliance with judicial pronouncements, and not an opening gambit in negotiations to reach an ultimate result. The statute gives us discretion, 42 U.S.C. § 1988, and the departure here was too extreme to be tolerated.

*Lewis,* 944 F.2d at 958.

Having recited the applicable principles, the Court must now apply them to the "plaintiffs'" fee application.

## C. The Plaintiffs' Fee Application

### 1. *Contemporaneousness and Reliability*

▆▆▆ In this case, the "plaintiffs'" fee application is not supported by *contemporaneous* time records. Paragraph 10 of Ms. Schiff's Affidavit in Support of Plaintiffs' Petition for Costs, Expenses, and Attorneys' Fees represents that the summary submitted "present[s] an accurate statement of services performed in connection with this litigation and was prepared from contemporaneous time records and, with respect to sums for costs and expenses, from accounting records." (Schiff Aff. 2/17/89 ¶ 10). However, that representation is flatly contradicted by the evidence.

On cross-examination, Ms. Schiff acknowledged that the time records submitted by the "plaintiffs" included "estimates" of the hours she spent on this case and how much time was attributable to other services she performed for the Lodge in her capacity as its general counsel. She further acknowledged that those "estimates" were made long after the work had been performed. (Tr. 8/18/89 at 62–65). She also conceded that records regarding many of the hours claimed were "reconstructed" from slips of paper on which she

made entries as long as three years after the services were performed. (Tr. 8/18/89 at 90–93). Moreover, she acknowledged that there were lags of up to six months in recording time that was entered directly into her permanent time records. (Tr. 8/18/89 at 97–98).

This abject failure to satisfy the contemporaneousness requirement cannot be dismissed as a mere technicality because it appears to have contributed to patent inaccuracies in the documentation purportedly supporting the "plaintiffs'" fee petition. For example, according to the records submitted, Ms. Schiff worked on this case for 25.7 hours on October 9, 1988, and 26.6 hours on October 10, 1988. While it may be possible to work around the clock for two consecutive days without respite, it clearly is impossible to do so for more than 24 hours in any one day.

The summary also indicates that on April 14, 1988, Ms. Schiff spent 8.9 hours travelling to New York for a meeting. That was only two days after she wrote to the Court advising that she was unable to meet a filing deadline because of a totally incapacitating illness that would prevent her from engaging in normal activities for 7–10 days. Her incapacity was confirmed by another letter she sent to the Court on April 20 indicating that she had been hospitalized until April 19.

Discrepancies of that nature cast serious doubt on the reliability of the "plaintiffs'" records and aptly illustrate why *contemporaneous* records are required. In this case, the "plaintiffs" have failed to satisfy that requirement.

### 2. *Allocation*

■ Besides not being contemporaneous or accurate, the records submitted fail to exclude hours spent on claims asserted by plaintiffs who did not prevail or on claims unsuccessfully asserted by Nunes. That failure is especially egregious because the Court specifically instructed the parties to submit records in a form that would permit such allocations. The "plaintiffs'" cavalier disregard of those instructions is apparent from the following exchange during the cross-examination of Ms. Schiff:

Q. Do you recall my asking you … "why didn't you allocate? Isn't it because you thought the Court was wrong in asking you to do that? Or did you forget to allocate, or what?" And you answered "I don't know if I like the 'or what'".

. . . .

"Question: Could it be that you forgot the Court told you to do it? Answer: It could be. It could also be I didn't have time. It could also be a number of reasons".

(Tr. 8/18/89 at 49–50).

"Plaintiffs" now seek to justify that failure by asserting that there is no need to allocate because their claims arise out of a common core of facts and are based on related legal theories. Therefore, they contend that they are entitled to compensation for time expended on both successful and unsuccessful claims. This Court finds no merit in that contention.

It is true that where successful and unsuccessful claims share a common nucleus of operative facts or are based on alternative legal theories seeking the same relief, the claims may be deemed so interrelated that it is impractical or unjust to exclude time spent on the unsuccessful ones in making an award of attorneys' fees. *Hensley*, 461 U.S. at 435–37, 103 S.Ct. at 1940–41. However, if the claims are separate and distinct, it is equally unjust to require the adverse party to pay for time expended on the meritless claims. *Hensley*, 461 U.S. at 434–35, 103 S.Ct. at 1939–40. Whether multiple claims are so intertwined that allocation is not required or sufficiently distinct that allocation is required depends on the facts and circumstances of each case.

In this case, the claims successfully and unsuccessfully asserted by the "plaintiffs" are separate and distinct in several respects. First, the successful and unsuccessful claims were asserted by different parties. As already noted, Nunes is the only plaintiff who "prevailed" on any claims. The claims of all other plaintiffs were either dismissed or resulted in judgments for the defendants. Accordingly,

those plaintiffs are not entitled to an award of attorneys' fees for time spent on their claims. *Perkins*, 728 F.2d at 1100.

In addition, Nunes' claims are temporally and qualitatively distinct from the claims asserted by the other plaintiffs. Nunes' claims were based on allegations of discrimination against *her during* and *after* the 1985–1986 Training Academy and sought damages for physical and emotional injuries to *her*. Most of the evidence she presented concerned incidents involving her personally and the injuries or damages she allegedly sustained. On the other hand, the claims of the other plaintiffs arose from unspecified events occurring *before* the 1985–1986 Training Academy (i.e., before Nunes had any connection with the State Police) or alleged efforts to suppress the Lodge's union activities.

Finally, there are significant distinctions among the claims asserted by Nunes herself. The claim on which she succeeded (i.e., Count V) was based on allegations of harassment *after* the Training Academy. The claims on which she was unsuccessful (i.e., Counts III and VIII) involved alleged harassment *during* the Training Academy. The difference in the proof underlying the two sets of claims is illustrated by the fact that the jury found Reynolds liable under Count III but not liable under Count V. It is further underscored by the fact that the jury found Stone and Benjamin liable under Count V but not liable under Count III. Therefore, while Nunes' claims may be loosely related, they are separate from each other.

In short, it is clear that the various claims asserted by the "plaintiffs" do not share a common core of law and facts. Consequently, they are separate and distinct, and the failure to exclude time spent on the unsuccessful claims or to submit records permitting such an allocation renders the "plaintiffs'" fee petition deficient. *See Jackson v. Illinois Prisoner Review Bd.*, 856 F.2d 890, 894 (7th Cir.1988) (unsuccessful *ex post facto* claim based upon different facts than was unrelated successful due process claim); *Sisco v. J.S. Alberici Construction Co.*, 733 F.2d 55, 58–59 (8th Cir.1984) (successful retaliation claim unrelated to unsuccessful affirmative-action discrimination claim).

### 3. *Exclusion of Unrelated, Excessive and Unproductive Time*

■ Besides ignoring the contemporaneousness and allocation requirements, the "plaintiffs" have failed to make a good faith effort to exclude hours spent on unrelated matters or hours that were duplicative or otherwise unproductive. For example, the time for which they seek compensation includes hours spent prosecuting a different suit by Linda Bailey in the State court. (Tr. 8/18/89 at 55–56). It also includes hours spent in lobbying the Rhode Island General Assembly for legislation desired by the Lodge. (Tr. 8/18/89 at 59–60). Furthermore, as already noted, it includes an indeterminate number of hours devoted to other Lodge business having nothing to do with this case. (Tr. 8/18/89 at 62).

The amount requested by the "plaintiffs" also encompasses hours spent on the numerous requests for continuances and extensions of time that they made during the course of this litigation and on a mandamus petition that they filed with the Court of Appeals in August of 1988 unsuccessfully challenging this Court's denial of the last in a series of requests to postpone the trial. In addition, the "plaintiffs'" have made no attempt to eliminate duplicative hours logged in those instances where two or more attorneys attended the same conferences, sat in on the same depositions or other proceedings and reviewed the same documents.

The net result is that the fee claimed has been grossly inflated. One measure of the extent of that inflation is the disproportion between the total time the "plaintiffs'" attorneys say they spent on this case and what one would expect was reasonably required. Thus, compensation is sought for more than 4,000 billable hours which represent more than two full years of a lawyer's billable time. However, despite the sweeping allegations contained in the complaint, the "plaintiffs'" claims were based on a relatively simple sequence of events occurring over a limited period of time. It is

inconceivable that even the most vigorous advocacy of those claims required anywhere near the number of hours for which the "plaintiffs" seek recovery.

#### 4. *Good Faith*

As already noted, an application for attorneys' fees pursuant to 42 U.S.C. § 1988 may be denied in its entirety if "manifestly filed in bad faith." *Jordan*, 691 F.2d at 518. In this case, the "plaintiffs'" failure to make any effort to exclude unrelated and/or unnecessary hours constitutes the kind of bad faith that warrants such a denial. *Lewis*, 944 F.2d at 958.

However, that failure tells only a small part of the story. What is far more disturbing is the misrepresentation made regarding the character of the records submitted in support of the fee application. Thus, it is difficult to reconcile the statement in Ms. Schiff's affidavit that the request "was prepared from contemporaneous time records" with her later admissions that a significant portion of those records was not contemporaneous. (Schiff Aff. 2/17/89 ¶ 10). It is even more difficult to explain that inconsistency in a charitable way because it appears that Ms. Schiff did not acknowledge that the records were not contemporaneous until after defense counsel become suspicious and expressed a desire to have them examined by handwriting experts. (Tr. 8/18/89 at 66–68).

The implications become even more ominous when one considers the affidavit of Gilles R. Robert, one of Ms. Schiff's former clients. The affidavit, notarized by Ms. Schiff, was submitted for the purpose of establishing Ms. Schiff's customary hourly billing rate. It states that Mr. Robert's company paid legal fees of more than $50,000.00 to Ms. Schiff at the rate of $150.00 per hour. (Robert Aff. 8/4/89 ¶ 5). However, Mr. Robert testified that the fees totalled less than $10,000.00 and that he was induced by Ms. Schiff to sign the affidavit without reading it. (Tr. 7/15/91 at 14–15). The Court finds Mr. Robert's testimony credible particularly since Ms. Schiff declined to cross-examine him or testify in

rebuttal apparently out of concern for her Fifth Amendment rights. (Tr. 7/15/91 at 6–8). Although fear of self-incrimination may be a valid reason for not testifying, it is difficult to see how an attorney's Fifth Amendment rights are implicated by cross-examining a witness. In any event, in a civil case, the Court may and does draw an adverse inference from Ms. Schiff's decision not to testify. *See Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976).

The "plaintiffs'" good faith becomes even more suspect when one considers the evidence suggesting that some of the hours for which fees are being claimed may have been devoted to accomplishing objectives unrelated to redressing the alleged sex discrimination and, therefore, are not compensable under § 1988. Thus, in a letter to the Lodge's president enumerating the benefits to be gained by initiating litigation, Ms. Schiff described the purposes of bringing suit to include "supporting the Lodge's efforts to improve the working conditions and economic status of its members" and providing "valuable discovery activity, gathering information useful in other areas" in order to counter what was perceived as the "union-busting tactics of the State and its counsel...."[4]

#### 5. *Expenses and Costs*

Under § 1988, a "prevailing" party is entitled to recover not only reasonable attorneys' fees but also the reasonable costs and expenses necessarily incurred in litigating its claims. 42 U.S.C. § 1988 (1988); *see also Palmigiano v. Garrahy*, 707 F.2d 636, 637 (1st Cir.1983) (per curiam). However, like requests for attorneys' fees, requests for costs and expenses must be properly documented. More specifically, a prevailing party must establish that they were both necessary and reasonable. *Zabkowicz*, 789 F.2d at 553.

In this case, no such showing has been made. Instead, the "plaintiffs'" claim for expenses is characterized by the same utter disregard for applicable requirements as their claim for attorneys' fees. Thus, they

---

**4.** See letter of May 25, 1986, attached as Appendix A.

assert that they have paid $22,510.17 for the services of three private investigators and approximately $40,000.00 in expert witness fees and expenses. However, they are unable to produce any bills or other documentation showing what services were performed, when they were rendered, how much time was involved, what rates were charged or what expenses are included in those sums. Those omissions are especially significant because none of the investigators or witnesses testified at trial, and therefore, the Court has no way to determine whether the services were necessary or whether the fees charged were reasonable. There is a similar lack of explanation or documentation with respect to more than $16,000.00 claimed for paralegal fees.

In addition, some of the expenses claimed clearly appear to be extravagant. Thus, a total of nearly $15,000.00 is claimed for "lodging" expenses. Of that amount, $4,800.00 is identified as "apartment rental" for the two out-of-state attorneys who participated in the trial. That sum, itself, seems excessive inasmuch as the trial lasted for only 17 days. The remaining $10,200.00 consists of hotel bills for unidentified "expert witnesses" who never testified and other individuals who were identified but whose roles in the case, if any, are unknown. By the same token, more than $12,000.00 is claimed for unitemized "transportation costs (air)" for many of the same individuals. No bills, receipts or other documentation were provided to substantiate those amounts. Nor was there any indication as to when most of these individuals came to Rhode Island, the purposes of their visits, where they stayed or how long they stayed.

Superimposed on this complete absence of documentation is the same kind of misrepresentation that permeates the "plaintiffs'" requests for attorneys' fees. Thus, the plaintiffs seek reimbursement for very precise amounts allegedly expended for items such as office supplies ($479.50 and $877.75), postage ($548.40), and photocopying ($10,320.00, $550.00, $3,689.23). Those figures clearly convey, and presumably were intended to convey, the impression that they were derived from detailed records or exact measurement of the quantities of each item involved. However, on cross-examination, Ms. Schiff admitted that they were only "estimates" and that there is no documentation to support them. (Tr. 8/18/89 at 125).

Moreover, evidence was presented that Ms. Schiff and the Lodge are defendants in a state court suit seeking payment for the charter jet fees being claimed as "air travel" expenses in this case. In that suit the Lodge, itself, has asserted that such expenses are unrelated to this case. (Tr. 7/15/89 at 19–20; Exhibit B).

In short, like their claim for attorneys' fees, the "plaintiffs'" claim for costs and expenses is so undocumented and riddled with misrepresentations that complete denial is warranted. *See Zabkowicz v. West Bend Co.*, 789 F.2d 540, 549–50 (7th Cir. 1986), *rev'g in part* 601 F.Supp. 139 (E.D.Wis.1985).

## II. *Defendants' Entitlement to Attorneys' Fees*

■ The standard for determining whether a victorious *defendant* is entitled to attorneys' fees under Title VII or § 1988 is more rigorous than that applicable to a successful *plaintiff*. In addition to demonstrating that it is a "prevailing party," a defendant must also establish that the plaintiff's action was "frivolous, unreasonable, or without foundation" or brought in bad faith. *Christiansburg Garment Co. v. Equal Opportunity Employment Comm'n*, 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978); *Hughes v. Rowe*, 449 U.S. 5, 14–16, 101 S.Ct. 173, 178–79, 66 L.Ed.2d 163 (1980) (per curiam); *Hensley*, 461 U.S. at 429 n. 2, 103 S.Ct. at 1937 n. 2.

In *Christiansburg*, the Supreme Court stated the rule applicable to Title VII cases as follows:

> In sum, a district court may in its discretion award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foun-

dation, even though not brought in subjective bad faith.

*Christiansburg,* 434 U.S. at 421, 98 S.Ct. at 700. In *Hughes,* that test was made applicable to § 1988, as well. *Hughes,* 449 U.S. at 14–16, 101 S.Ct. at 178–79; *see also Cloutier v. Town of Epping,* 714 F.2d 1184, 1193 (1st Cir.1983) ("Defendants are entitled to attorneys' fees under section 1988 only when 'a court finds that [the plaintiff's] claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so.'") (citations omitted). Although it is not necessary to show subjective bad faith, a prevailing defendant may be entitled to attorney's fees if the suit was, among other things, "brought to harass or embarrass the defendant." *Hensley,* 461 U.S. at 429 n. 2, 103 S.Ct. at 1937 n. 2.

The First Circuit has, on several occasions, applied these principles in requiring plaintiffs whose claims were deemed groundless to pay the defendants' attorneys' fees. *See, e.g., Raskiewicz v. Town of New Boston,* 754 F.2d 38, 45–46 (1st Cir.1985); *Charves v. Western Union Telegraph Co.,* 711 F.2d 462, 464–65 (1st Cir.1983). When multiple defendants are involved, the claims against each must be evaluated separately. *See, e.g., Gerena–Valentin v. Koch,* 739 F.2d 755, 761–62 (2d Cir.1984). Thus, claims against one defendant may be deemed frivolous even though the claims against other defendants are not.

In this case, it is clear that both Violet and Reynolds satisfy the "prevailing party" component of the test. Dismissals or judgments in their favor were entered with respect to all of the claims asserted against them. Therefore, the question presented is whether the claims against them can be characterized as frivolous or brought in bad faith.

A. Violet

■■■ One does not have to go beyond the face of the complaint to conclude that the claim against Attorney General Violet was frivolous. The two counts directed against her (i.e., Counts III and IV) charge sex discrimination during the 1985–1986 Training Academy. In order to prevail on either of those claims, the plaintiffs were required to prove that Violet treated women less favorably on account of their gender. Such claims are patently groundless. First, Violet, herself, is a woman. Moreover, the only factual allegations made to support those claims were that Violet failed to take action to redress the complaints made by several female candidates. (Compl. ¶¶ 37–48). The Complaint is devoid of any allegations that Violet was motivated by any intent to discriminate against women. In fact, plaintiffs' counsel admitted that no such contention was being made. (Tr. 8/25/88 at 27–28).

In addition, in order to prevail under Title VII, the plaintiffs were required to prove that Violet was their "employer." Any such claim is without foundation in this case because, as the plaintiffs' counsel concedes, the Rhode Island Attorney General plays no role in hiring or directing state troopers. (Tr. 8/25/88 at 24). Supervision of the State Police is vested in the Governor who is a separately elected official and heads an entirely different department of government. *See* R.I. Gen.Laws § 42–28–1 and § 42–28–5 (1956) (1988 Reenactment).

It was for those reasons that this Court granted Violet's motion for judgment on the pleadings. It is also for those reasons that the Court now concludes that the claims asserted against Violet were frivolous. They might further be characterized as brought to harass and embarrass because, as previously noted, the letter of May 25, 1986, from Ms. Schiff to the then president of the Lodge suggests that the "plaintiffs" brought this suit not to seek redress for alleged sex discrimination but rather as part of a continuing labor/management struggle between the Lodge and the official leadership of the Rhode Island State Police. *See supra* p. 124.

This Court is in no position to make any judgments regarding the merits of that dispute, and, in any event, such a judgment would be irrelevant in this case. What is

relevant is that an effort to accomplish a goal completely unrelated to the stated purpose of litigation by making unsupportable claims against third persons constitutes the kind of bad faith that warrants an award of attorneys' fees.

The amount that should be awarded to Violet is easily determined. Neither the number of hours documented by her counsel nor the reasonableness of the hourly rates claimed are in dispute. (Tr. 8/18/89 at 42). Therefore, the Court finds that Violet is entitled to attorneys' fees of $54,168.50, the full amount claimed.

### B. Reynolds

 Reynolds' claim for attorneys' fees presents a much closer question. The Court already has expressed its opinion that the evidence was insufficient to support the claims against Reynolds. The Court permitted those claims to go to the jury to avoid any need for a retrial if his motion for a directed verdict had been granted sooner and then overturned on appeal. As already noted, the jury found in Reynolds' favor on Counts V and VIII but returned a verdict against him with respect to Count III.

In any event, neither a jury verdict in a defendant's favor nor the granting of a motion for a directed verdict is tantamount to a finding that a claim was frivolous within the meaning of § 1988. *See, e.g., Roberts v. Spalding,* 783 F.2d 867, 874 (9th Cir.), *cert. denied,* 479 U.S. 930, 107 S.Ct. 399, 93 L.Ed.2d 352 (1986). Section 1988 represents a departure from the traditional American rule that each party should bear its own litigation costs. It was not intended to deter plaintiffs from bringing claims of arguable merit by requiring that they pay a defendant's attorneys' fees merely because they lose. Therefore, a finding of frivolousness requires a showing that the claims asserted were groundless, that is to say, that a reasonable person would recognize them as having no merit.

In this case, Nunes' claims against Reynolds were, at least, colorable. She presented some evidence that could be viewed as supporting her claim of discrimination by Reynolds during the 1985–1986 Training Academy. The clearest indication of that is the fact that the jury returned a verdict in her favor with respect to Count III. The possibility that the claims asserted against Reynolds in Counts V and VIII (sex discrimination/retaliation after the 1985–1986 Training Academy) might be characterized as frivolous does not permit an award of attorneys' fees because, like the "plaintiffs," Reynolds has made no effort to allocate the hours claimed between the claims set forth in Count III and those set forth in Counts V and VIII.

### CONCLUSION

For all of the foregoing reasons, Plaintiffs' Petition for Costs, Expenses and Attorneys' Fees is denied in its entirety; Violet's Motion for Attorneys' Fees is granted against all plaintiffs in the amount of $54,168.50; and Reynolds' Motion for Attorneys' Fees is denied.

In addition, the Clerk is directed to transmit a copy of this Memorandum and Order to the Chief Disciplinary Counsel of the Rhode Island Supreme Court for such investigation and/or disciplinary action as she may deem appropriate.

IT IS SO ORDERED.

### APPENDIX A

May 25, 1986

Trooper Alvin T. Pontarelli

President

Rhode Island State Police Lodge 25

Fraternal Order of Police

9 Homestead Avenue

Johnston, Rhode Island 02919

*Proposed Litigation with the
State of Rhode Island*

Dear Alvin:

As you requested, this letter summarizes the discussions and presents the opinions of Bob Moss and myself regarding proposed litigation in federal court against the State of Rhode Island and its officials because of violations of the rights of Lodge

25, members of the bargaining unit in general, and, if the individuals concerned are willing to sign complaints, certain female troopers.

I will begin this letter with the caution that this communication is a privileged communication, in preparation for litigation and trial, from me to my client, Lodge 25. Consequently, the contents of this letter are privileged and are not discoverable; however, the Lodge and/or its officers may intentionally or inadvertently waive any claim to such privilege by disclosure of this letter or its contents to third parties.

As you know, I view my efforts on behalf of Lodge 25, Fraternal Order of Police as supporting the Lodge's efforts to improve the working conditions and economic status of its members. Therefore, my recommendations have been made not from the standpoint of accomplishing any abstract goals of "justice" but instead with a view to protecting the basic rights of the Lodge and its members, making the State and its officials liable for misconduct in violation of such rights, and enhancing the ability of the Lodge to effectively represent the membership.

I have recommended (and, as you know, Bob Moss concurs in this recommendation) that Lodge 25 file suit in the United States District Court pursuant to 42 U.S.C. § 1983 (which prohibits violations of any right guaranteed by the Constitution or law by any state or any person acting under state authority) and 42 U.S.C. § 1985 (which prohibits conspiracies to violate such rights). The allegations contained in this suit would be, in general terms, that:

1. The State of Rhode Island and various of its officials abused prosecutorial power to obtain an unlawful grand jury subpoena for Lodge 25 meeting and attendance records.

2. The State of Rhode Island and various of its officials have violated the rights of Lodge 25 and its members to associate freely and exercise free speech rights at meetings by certain efforts, including the unlawful subpoena.

3. The State of Rhode Island has retaliated against Lodge 25 because of the Lodge's support of Trooper Mary Nunes.

4. The State of Rhode Island and various of its officials and attorneys, including Thomas McAndrew, have followed a pattern and practice of denial of the rights of troopers, including training academy presentations providing false and/or misleading information about troopers' rights.

5. The State of Rhode Island and various of its officials have attempted to deny to Lodge 25 and its members certain rights guaranteed to it by state law, including labor organizing and collective bargaining rights.

6. The State of Rhode Island and various of its officials have continued a pattern and practice of sex discrimination.

7. The State of Rhode Island and various of its officials have retaliated against Lodge 25 for the Lodge's representation of a troopers, regardless of sex or race.

8. The State of Rhode Island and various of its officials have discriminated against members of the Lodge on the basis of age by allowing certain superior officers to serve past the age of 70 and/or for more than 27 years while routinely refusing to re-enlist troopers, corporals, and sergeants with 21 years of service.

Lynette Labinger, Bob Moss, and I have reviewed this matter in detail. It is our belief that the Lodge would prevail in such civil rights action against the State, Stone, Benjamin, Reynolds, McAndrew and others seeking injunctive relief, monetary damages, costs, and attorney's fees. We further believe that commencing such action:

- would have a high probability of success;

- might deter future assaults on Lodge;

- would result in valuable discovery activity, gathering information useful in other areas and allowing us to depose not just the old standby, Major Benjamin, but also Colonel Stone, Governor DiPrete, assorted state police internal affairs personnel, and others;

• would further deter some of your department's more peculiar personnel practices.

We are also aware that negative implications of such action could include:

• The creation of an additional source of conflict and contention between the Lodge and the Division of State Police;

• Escalation of hostilities between Lodge 25 and Colonel Stone;

• Retaliation against the Lodge and individual troopers.

Considering all of the foregoing, it is our collective opinion that the Lodge should proceed with the recommended litigation. We say this because:

1. We believe that the Lodge and its members have been injured by the State and certain officials.

2. Circumstances and errors on the part of the State now present the Lodge with an opportunity to combine certain, very winnable federal claims with state law claims which might otherwise never even get to court.

3. Initiation and prosecution of the recommended lawsuit are the only real weapons available to the Lodge and its members to counter the very professional and experienced union-busing tactics of the State and its counsel. The State is forcing the Lodge to either abandon its contractual rights or to repeatedly engage in expensive arbitrations, knowing that you will run out of cash long before the State does. Prosecuting a civil rights suit (which will bring not only your complaints but also the antics of the state police administration into the open) should improve the atmosphere in which you must work and reduce the number of grievances and arbitrations.

*A personal observation:*

As some of you know, while I was Assistant Attorney General—Civil Division of the State of Delaware, I served as legal counsel to the Superintendent of the Delaware State Police. Nothing in that experience, however, prepared me for the things I have seen in your department. The conduct of the Rhode Island State Police administration is not normal conduct for a law enforcement agency's administration in the Twentieth Century. Perhaps, conditions have prevailed for so long that the outrageous has become the accepted. Judge Pettine's intervention at the ACI has guaranteed to its inmates due process which is, apparently, routinely denied to members of the Division of State Police. My personal perspective is that the Lodge should exploit the current opportunity to bring sanity to the way the State deals with its troopers. If you do not, it is probable that things will only get worse until, at some point, an outside agency or group (like the NAACP, for example) intervenes and obtains relief which may not be completely to the Lodge's liking or which excludes the Lodge's input.

In short, we believe that the Lodge should prosecute the recommended civil rights action, whether it retains me or any other competent attorney.

If the female troopers who have come forward with complaints are willing to sign such complaints and affidavits, we believe that these sex discrimination charges should be incorporated in the proposed action because they would materially strengthen our position. Should these troopers be unwilling to sign such complaints, we recommend against the Lodge prosecuting a sex discrimination matter on their behalf.

If the female troopers are willing to come forward, Lynette Labinger has agreed to appear as co-counsel. Lynette has exceptional experience in successful prosecutions of sex discrimination cases generally and of cases brought by female police officers in particular. We believe this is situation where the Lodge and its female members have a unique opportunity to help one another. Filing a single action makes the cases of both the Lodge and the female troopers many times stronger than either case would be by itself.

By way of example, my intention in dealing with the recent Nunes–DeRobbio matter has been to link the Division of State Police's actions with Trooper Nunes into its

general maltreatment of troopers and to the pending litigation regarding sex discrimination (brought by the Department of Justice). I have asserted that I have intervened on behalf of Lodge 25 and Nunes, presenting to the Department of Justice the position that attack on Nunes is part of attack on Lodge 25—as retaliation for the Lodge's support of female troopers. To that end, I have portrayed Lodge 25 as the protector of rights of all troopers, and, as a result, the Department of Justice has written to the Attorney General concerning this matter, requesting the Attorney General, in effect, to show cause why the State should not be held in contempt of a consent order entered in the sex discrimination case. By forcing Justice to scrutinize the conduct of Stone, McAndrew, and others, we have enhanced the ability of the Lodge to protect all its members and made any disciplinary action against Trooper Nunes less likely. (See, blind carbon of letter received from Department of Justice, attached.)

At the same time, I have asserted the position that the Rhode Island Law Enforcement Officers' Bill of Rights controls all complaints and disciplinary actions regarding members of the Rhode Island State Police, forcing the state police administration to concede, for the first time, the applicability of that bill of rights to troopers. This is a good example of a situation in which a specific complaint can be used to achieve a benefit for all.

Should the Lodge elect to prosecute such an action, I would be willing to proceed, without any retainer, provided that Lodge 25 pays all costs and fees as incurred and with the understandings that:

1. Bob Moss would be involved to provide coordination of this litigation with other Lodge activities. (You should be aware that it is entirely likely that the State may seek to link settlement of any lawsuit filed with settlement of various contract and/or arbitration issues.)

2. Because this is a civil rights action, we will seek recovery of all costs and attorneys' fees from the State and other defendants should we, as expected, prevail.

3. In the event that this case is not settled and goes to trial, it will require approximately 75 to 100 hours of total attorney time during the next two years.

4. Because of my representation of many of the Lodge's members in the veterans' rights cases and my knowledge of the serious drain that the State's tactics have placed upon the Lodge's treasury, I will discount my normal hourly rate from $150 per hour to $95 per hour, and I will bill trial time at $95 per hour instead of my customary $1750 per day. I have asked Lynette labinger if she will reduce her normal rates accept this matter on a similar basis, and she has agreed to do so.

Finally, I believe that it is extremely important that you review any proposed litigation in detail with members of the Lodge 25 executive committee and obtain their approval of the litigation, and I know that Bob Moss has provided you with similar advice.

Should you or any executive committee member have any questions or just want to discuss these matters, feel free to call me.

Very truly yours,

(s) Ina

Ina P. Schiff

cc: Robert J. Moss, Esquire
 Lynette Labinger, Esquire

Enclosures