James J. POWERS

v.

STATE of Rhode Island.

No. 97-327-C.A.

Supreme Court of Rhode Island.

July 16, 1999.

Marie T. Roebuck, Providence, for plaintiff.

Aaron L. Weisman, Providence, for defendant.

Present WEISBERGER, C.J., and LEDERBERG, FLANDERS, and GOLDBERG, JJ.

## OPINION

GOLDBERG, Justice.

A cold-blooded execution-style murder of a seventeen-year-old boy brings James J. Powers (Powers) before this Court for a fourth time. On this occasion, Powers appeals the denial of his application for post-conviction relief and asserts a veritable legal smorgasbord of errors. After examining the voluminous record, which spans nearly twenty years, we reject all claims.

## I

### Factual Background

In mid-June 1981, approximately two or three weeks before the murder, and while in the State of California, the events preceding this senseless slaying began to unfold when Powers and a friend, Colleen McCabe (McCabe), discussed returning to Rhode Island. Although McCabe's reasons for returning to Rhode Island were not apparent, Powers clearly had his own sinister agenda. According to McCabe, the stated purpose of Powers' trip back to Rhode Island was "to get a gun," "do a score and then go back to California." In accordance with his plan, Powers, McCabe, and her daughter returned to Rhode Island and, as promised, Powers set out to obtain a firearm.

The trial testimony revealed that in late June 1981, Powers contacted his friend, Peter D'Ambra (D'Ambra), to see whether D'Ambra "could get him a gun." Thereafter, D'Ambra consulted a friend, Richard Steinkamp (Steinkamp), regarding Powers' request, and in turn, Steinkamp contacted Kurt Deines (Deines), a gunsmith. On July 2, 1981, Deines loaned Steinkamp a .22 caliber weapon (serial number 649747) with a slender Sport King barrel.[1]

---

1. Throughout this opinion, we shall refer to two .22 caliber weapons—one with a slender

Powers spent much of the next day, July 3, 1981, at the beach located within Goddard Park. At approximately 4:30 p.m., Powers, D'Ambra, and two women left the beach and eventually stopped at a Providence apartment where Powers changed from his swimwear into dark clothes and long pants.[2] Several errands later, Powers and D'Ambra proceeded toward Steinkamp's home, but D'Ambra left Powers at a nearby store in order to proceed to Steinkamp's alone so that Steinkamp would believe that the gun was intended for D'Ambra's own personal use. Subsequently, D'Ambra obtained the .22 caliber weapon (serial number 649747) with a slender Sport King barrel from Steinkamp. D'Ambra then picked up Powers from the store and transferred the .22 caliber weapon to him. At approximately 8 p.m., D'Ambra left Powers on Oakland Beach Avenue and by Powers' own admission, no one can account for his whereabouts for the next two hours.

The trial testimony revealed that at approximately 10 p.m., Adam Mowry (Mowry) and his then-girlfriend Pauline Krueger (Krueger), were sitting in front of the Lutheran Church on Warwick Avenue to view the evening's fireworks. Across the street from the Lutheran Church was the E–Mart gas station, which was staffed by a lone night attendant. Krueger testified that at approximately 10 p.m., she observed an individual, later determined to be Powers, crouching in the bushes adjacent to the gas station, wearing a blue jean jacket, blue jeans, and a nylon stocking over his head,. Krueger alerted Mowry, who attempted to warn the night attendant

of the impending danger. Mowry's good intentions, however, were no match for Powers' coldly-calculated plan, and as Mowry crossed Warwick Avenue, Powers ran into the gas station, grabbed the young attendant, and stuck what appeared to be a gun into his stomach. Mowry turned his attention to alerting the police of the crime in progress and ran to an ice cream parlor adjacent to the gas station. Unfortunately, the parlor was not equipped with a telephone. As Mowry ran back around the side of the gas station, he observed Powers fleeing from the scene, and soon thereafter, he discovered the night attendant lying on the gas station's floor in a pool of blood.

The gas station attendant, who had just turned seventeen, was later identified as Robert Craig Caldwell (Caldwell). Caldwell had been working at the E–Mart gas station for only two or three weeks while on summer vacation following the completion of his first year of college at the University of Rhode Island. The evidence indicated that Powers herded Caldwell into the gas station's office, and shot him at close range, in the back of the neck with a .22 caliber gun. Caldwell was later pronounced dead at Kent County Memorial Hospital.

In addition to Mowry's and Krueger's corroborating testimony, the 1982 trial record also contained the testimony of D'Ambra's mother, Antonetta D'Ambra (Antonetta). Antonetta testified that shortly after 10 p.m. on the evening of July 3, 1981, Powers appeared unexpectedly at her home, located a short distance

---

Sport King barrel (serial number 649747), which was determined to be the murder weapon, and the other a heavy Field King barrel (serial number 453233). Both weapons were owned by Deines, seized in conjunction with this case, tested, and entered into evidence. *At various points in this opinion, the two weapons shall be distinguished by their serial numbers.*

**2.** By way of background, we note that *McCabe's testimony revealed that at approxi-*

mately 5 p.m., Powers called to invite her to dinner later that evening. In response, McCabe "asked him how he had planned on doing that * * * since he didn't have any money." According to McCabe, Powers answered, "that he would get some [money] * * * the only way he knew how." The conversation ended with Powers stating that he would call McCabe around 7 p.m.; he never did.

from the E–Mart.[3] Antonetta was surprised by Powers' unannounced visit and observed Powers wearing dark clothes and walking with a limp. After hearing an increasing number of police sirens nearby, Antonetta asked Powers whether he was in trouble with the police; an accusation that Powers denied. Instead, Powers falsely claimed that he had made prior arrangements to meet D'Ambra at his mother's home. D'Ambra soon arrived at his mother's house after receiving a telephone call alerting him to the fact that Powers was presently at this location and was waiting for him to arrive. Thereafter, D'Ambra picked-up Powers and drove him back to his apartment.

Meanwhile, as the events at Antonetta's home developed, Steinkamp, the individual who had loaned the .22 caliber gun to D'Ambra, learned of the E–Mart shooting. Fearing that the loaned weapon may have been utilized during the shooting, Steinkamp repeatedly attempted to telephone D'Ambra. After receiving several busy signals, Steinkamp drove to D'Ambra's apartment where he learned that D'Ambra was not at home, but would return shortly. Steinkamp waited outside, and when D'Ambra and Powers did return, all three entered the apartment.

Once inside D'Ambra's apartment, Steinkamp demanded the return of the .22 caliber pistol. Noticing how frantic and upset Steinkamp appeared, D'Ambra assured him that the loaned gun was upstairs, inside the apartment. Thereafter, D'Ambra proceeded upstairs in order to ask Powers about the location of the weapon. D'Ambra then retrieved the weapon from the master bedroom and returned it to Steinkamp. Steinkamp, in turn, left D'Ambra's apartment for Deines' house, in order to return the gun.

Later that evening, back at D'Ambra's apartment, D'Ambra informed Powers that Deines would know if the gun had been fired. Faced with this possibility, Powers admitted to D'Ambra that he had robbed the E–Mart gas station and shot the young attendant.

Several weeks later, in mid-July 1981, Powers returned to California, and while there, informed his friend, Gary LeMay (LeMay), that he had been stopped and questioned about a murder while in Rhode Island. This statement prompted LeMay to inquire, "well did you do it," to which Powers boasted "[Y]es, I killed the fuckin' kid." According to LeMay, Powers detailed "that he went * * * to hold the gas station up[;] * * * that he was hiding in the woods behind the building[;] * * * [that] he came around the front, went in and stuck the guy up [;] got the money from the guy[;] * * * [and that because] he thought that the guy noticed his face, [and] his mask, he turned him around and he shot him." LeMay's testimony also corroborated Mowry's and Krueger's earlier testimony that Powers wore a nylon stocking over his head, used a .22 caliber handgun, and fled "the gas station, went through the woods and went over to [Antonetta's] house."

Predictably, Powers' version of these events were markedly different. Despite his history of being a self-professed professional thief, as well as a self-professed gunman, and his admission that he was looking to obtain a gun in early July in order to "make some money," Powers denied any involvement in the E–Mart shooting. Instead, Powers accused his friend D'Ambra of the murder, and claimed that it was he (Powers) who attempted to locate a gun for D'Ambra, and that at D'Ambra's insistence, he (Powers) obtained .22 caliber bullets from a friend, Raymond Ross (Ross). In addition, Powers maintained that he and D'Ambra had made prior arrangements to meet at Antonetta's house at approximately 10 p.m., that five unknown individuals assaulted him at a Del's Lemonade stand just prior to 10 p.m., and

---

**3.** We note that the trial evidence demonstrated that the distance from the E–Mart gas station to Antonetta's home was estimated to be one-quarter of a mile.

that he had helped D'Ambra destroy evidence "that could tie him in this crime."[4]

Following a jury trial, at Kent County Superior Court, Powers was found guilty of both felony-murder and robbery, and after denying Powers' motion for a new trial, the trial justice sentenced Powers to life in prison on the felony-murder conviction.

On appeal, we affirmed the felony-murder conviction, but agreed with the trial justice that the conviction on the companion robbery count merged into the conviction for murder and that Powers could not be convicted of both. *State v. Powers*, 526 A.2d 489 (R.I.1987) (vacating robbery conviction, but remanding the case to the trial justice for a determination of whether incriminating statements were deliberately withheld). However, in 1992, over ten years after Powers' apprehension for the murder of Caldwell, the state prosecuted Powers on count seven of the indictment, an unrelated gun charge that had been severed by the trial justice despite Powers' vigorous objection on the grounds of lack of a speedy trial. This Court was subsequently compelled to vacate Powers' conviction on this count for lack of a speedy trial. *State v. Powers*, 643 A.2d 827, 833 (R.I.1994). Apparently, as a result of testimony elicited at these later proceedings, Powers seized upon some perceived discrepancies and filed the instant three-count application for post-conviction relief. In his petition Powers averred that his felony-murder conviction should be vacated due to: (1) the deliberate withholding of additional exculpatory evidence; (2) the denial of due process as a result of the state's discovery violations; and (3) the denial of effective assistance of counsel. A trial was held before a justice of the Superior Court at the conclusion of which Powers' application was denied. On appeal, Powers asserts a myriad of issues, but as the post-conviction relief trial justice recognized, these issues can be segregated into three main categories: (1) perjured testimony; (2) improperly withheld evidence/newly discovered evidence; and (3) ineffective assistance of counsel. After canvassing the record, we conclude that Powers' claims are wholly without merit. Additional facts shall be provided as necessary.

## II

### Standard of Review

Post-conviction relief is available to any person in this state pursuant to G.L.1956 chapter 9.1 of title 10, who, after having been convicted of a crime, claims, "*'inter alia*, that the conviction violated [his or her] constitutional rights or that newly discovered facts require vacation of the conviction in the interest of justice.'"

---

4. Without reiterating the relevant facts, we note that Powers' posture of this case is at odds with the testimony of many witnesses. First, the state introduced the testimony of Vincent Russo (Russo), the owner of the Del's Lemonade where Powers alleged to have been assaulted. Russo testified that he was at this franchise until after 10 p.m. on the night in question and that there was "[d]efinitely not" a fight or disturbance that evening. Second, Powers' friend Ross testified that at some time between 7:30 p.m. and 8 p.m., he was driving down Oakland Beach Avenue and encountered Powers standing near the corner. Ross testified that Powers signaled him to stop his truck and then inquired whether Ross "knew where he could get some .22 caliber bullets." Ross responded in the negative and the two parted company. Lastly, D'Ambra testified that he had made no plans to meet Powers at his mother's house at 10 p.m. and only fabricated this story because "I knew my mother didn't like [Powers] and I just wanted to make up an excuse why [Powers] was there." Moreover, in direct conflict with Powers' assertion that D'Ambra is the real killer, the trial record evinces that after D'Ambra dropped Powers at the corner of Oakland Beach Avenue at approximately 8 p.m., D'Ambra returned to his apartment where he remained until after 10 p.m. when he received a phone call informing him that Powers was at his mother's house. The testimony concerning D'Ambra's whereabouts during these two critical hours was also supported by his then live-in girlfriend, Donna J. Simas, who testified that D'Ambra was at their apartment from 8 p.m. until he "got a phone call * * * from his sister."

**514**

*Mastracchio v. Moran,* 698 A.2d 706, 710 (R.I.1997). Here, Powers asserts that the withholding of exculpatory evidence, as well as the presentation of perjurious testimony, violated his rights to due process. In addition, Powers claims that the performance of his attorney was so deficient that it violated his right to counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. As a result of Powers' tripartite attack on his conviction, this appeal presents a mixed question of law and fact involving constitutional issues, and as such, the ultimate determination concerning whether Powers' constitutional rights have been infringed must be reviewed *de novo. See Ornelas v. United States,* 517 U.S. 690, 696–97, 116 S.Ct. 1657, 1661–62, 134 L.Ed.2d 911, 919 (1996); *Broccoli v. Moran,* 698 A.2d 720, 725 (R.I.1997); *Mastracchio,* 698 A.2d at 710. Despite this *de novo* standard regarding ultimate determinations, however, the Supreme Court has warned *"that a reviewing court should take care * * * to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts * * *." Ornelas,* 517 U.S. at 699, 116 S.Ct. at 1663, 134 L.Ed.2d at 920. (Emphasis added.) *See also Broccoli,* 698 A.2d at 725; *Mastracchio,* 698 A.2d at 710; *LaChappelle v. State,* 686 A.2d 924, 926 (R.I.1996). Therefore, although we review *de novo* the post-conviction relief challenging the trial justice's ultimate determination that Powers' constitutional rights were not violated, we grant great deference to the historical findings and the inferences drawn therefrom. Against this backdrop, we review Powers' claims.

### III

#### The *Kyles* Standard

 In order for Powers to succeed on his claims concerning newly discovered evidence and/or perjured testimony, he must demonstrate that the recently discovered evidence was not merely cumulative or impeaching, but that it was material.

*Mastracchio,* 698 A.2d at 714, 719. In *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the United States Supreme Court discussed the materiality of evidence in a post-conviction relief proceeding. The Supreme Court stated that the

"touchstone of materiality is a 'reasonable probability' of a different result * * *. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' * * * A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One * * * [must show] that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 434–35, 115 S.Ct. at 1566, 131 L.Ed.2d at 506 (quoting *United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481, 491 (1985)).

Accordingly, in order for Powers to be successful on this appeal, he must demonstrate that either the "newly discovered evidence" or the "recently uncovered perjury" places this case "in such a different light as to undermine confidence in the verdict." *Mastracchio,* 698 A.2d at 715.

### IV

#### Alleged Perjury

 It is beyond the authority of numerous citations that a prosecutor cannot

knowingly present perjurious testimony. *State v. Gomes*, 604 A.2d 1249, 1254 (R.I. 1992). "Where the prosecutor has deliberately caused false evidence to influence some part of the criminal trial, he [or she] has violated the most basic precepts of due process." *In re Ouimette*, 115 R.I. 169, 175, 342 A.2d 250, 253 (1975). *See also Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217, 1221 (1959).

In his brief to this Court, Powers asserts that a "chain of deception and trickery" consisting of a continuing pattern of perjurious testimony, implicated him in the murder of Caldwell. Among those Powers accuses of perjury are: LeMay and D'Ambra, Warwick Police Detective Jerome Bessell, Massachusetts State Trooper Michael Arnold, and Special Assistant Attorney General Daniel Schrock. Save one exception, Powers fails to direct us to any so-called perjurious statements. Moreover, we conclude that the one specific allegation to which Powers directs our attention involves no inconsistency.

■ By way of background, this situation involved a trip to a firing range shortly after the murder wherein Deines and Robert L. Swinehart (Swinehart) fired several hundred rounds of ammunition from numerous weapons, including the murder weapon. Swinehart then retrieved and saved eight spent cartridge casings, purportedly fired from the unaltered murder weapon. On appeal, Powers claims that Trooper Arnold's 1982 trial testimony, stating that the eight shell casings retrieved from the firing range on July 5, 1981, "were all fired from the same unknown weapon" is at odds with Trooper Arnold's 1992 trial testimony, that he "can't rule * * * out" that all eight shells were fired from the .22 caliber Sport King weapon (serial number 649747).

According to Powers, this so-called inconsistency demonstrates that "for the first time in 1992, * * * these eight (8) shells could have been fired from the Sport King weapon and are not shells from some 'unknown weapon' as testified to in 1982." The post-conviction relief trial justice dismissed Powers' semantics, stating "there is no inconsistency in the opinions expressed by Trooper Arnold as a witness." We agree, and in fact, highlight a portion of Trooper Arnold's 1992 testimony to support our conclusion that if Trooper Arnold had been asked whether the eight shell casings were fired from Deines' other .22 caliber gun, the Field King (serial number 453233), he would not have ruled out that weapon either.[5]

■ Powers' remaining allegations are of no moment and require little analysis. For instance, Powers' claims that Trooper Arnold's 1982 trial testimony is "[c]learly * * * false and misleading," and that Trooper Arnold's 1992 testimony, specifically the portion wherein he could not recall whether he had met with Deines in Boston between the dates of March 24, 1982, and April 1, 1982, was perjurious. With respect to Trooper Arnold's 1982 tes-

---

5. Trooper Arnold's 1992 trial testimony provides the following colloquy:

"Q. Isn't it true from your physical examination of these eight shells that you cannot rule out that State's [exhibit] one slide 649747 fired those eight?"
"A. *I couldn't rule out either of those weapons as far as firing those eight.* What I could do was say that the extractor markings on slide 649747 were similar to these eight discharge cartridge casing * * *, however, there was an insufficient amount of striations to make a positive identification."

"Q. *And so you cannot as between the two of them, strike that, please.* It is fair to say then can you not rule out that those eight shells * * * could have been fired from [the Sport King (serial number 649747) ]?"
"A. I can't rule that out."
"Q. And those similar striations in those eight shells and the extractor markings being in the same place, those facts would be consistent with [the Sport King (serial number 649747) ] having fired those shells, is that correct, *not conclusive, but consistent*?"
"A. That is correct." (Emphases added.)

timony, Powers has failed to direct us to any testimony that would lead us to believe that Trooper Arnold committed perjury. Nonetheless, we have reviewed Trooper Arnold's 1982 testimony and conclude, as did the post-conviction relief trial justice, that there is "no basis to conclude that Arnold perjured himself while testifying at the original Powers trial." Furthermore, Trooper Arnold's 1992 inability to recall whether or not he had met with Deines, the gunsmith, between the dates of March 24, 1982, and April 1, 1982, cannot alone serve as the basis of proof by a preponderance of the evidence of perjury. *Cf. United States v. Tavares,* 93 F.3d 10, 14 (1st Cir.1996) ("[i]nconsistent testimony by itself does not amount to perjury").

■ In addition to these broad claims brought against Trooper Arnold's testimony, Powers claims that LeMay's 1996 deposition testimony proves that his earlier testimony during Powers' original trial was perjurious by alleging that: (1) LeMay had received three monetary payments from a neighbor who was also a detective on the Warwick police force; (2) this detective had contacted LeMay to secure his 1982 trial testimony; and (3) LeMay had met with this detective in Roger Williams Park whereupon he forged a confession purportedly authored by Powers. LeMay's deposition testimony concerning these averments, however, even if true, cannot establish a case for perjury, because, as Powers inadvertently concedes in his brief to this Court, "[t]hese [three aforementioned] promises, rewards, and inducements * * * were disclosed for the first time during [the 1996] deposition." The post-conviction relief trial justice agreed and specifically stated that:

> "this witness, Mr. LeMay, did not testify about payments to him during the first Powers' trial, nor was he asked about payments to him at that trial. Accordingly, the Court finds that the testimony that was given by Mr. LeMay was not perjury. The Court finds that he could not have perjured

himself at that trial even if, in fact, such payments had been made because he did not testify with respect to payments, nor was he specifically asked that question." *See generally, Mastracchio,* 698 A.2d at 719 (although testimony may have been somewhat misleading, because witness was not specifically asked pertinent questions, testimony did not amount to perjury).

In addition to Arnold's and LeMay's testimony, Powers generally asserts that both Prosecutor Schrock and Detective Bessell perjured themselves during the 1987–88 evidentiary hearing when they testified that they had disclosed all discoverable material and that D'Ambra perjured himself by implicating Powers in the murder. Powers also draws an inference of prior perjury from LeMay's invocation of his Fifth Amendment right against self-incrimination and speculates that the only reason the state did not call certain witnesses to testify was because it feared the commission of additional acts of perjury.

■ We reject these theories and note that while an adverse inference may be drawn from a witness' decision not to answer questions during a civil proceeding, the post-conviction relief trial justice did not make this finding and neither shall we. *See In the Matter of Schiff,* 684 A.2d 1126, 1135 (R.I.1996). Moreover, the trial justice at Powers' original trial found that all of the aforementioned witnesses were credible and noted that the only person whose testimony was incredible was Powers'. In no uncertain terms the 1982 trial justice stated:

> "I am convinced beyond any doubt whatsoever that the defendant, James J. Powers, lied here in this courtroom while under oath. His story was indeed a cool and a calculated and a deliberate attempt to involve and blame everyone who, so to speak, pointed the finger of guilt at him."

## V

### Newly Discovered Evidence

In reviewing Powers' claims relative to newly discovered evidence, we rely on the following:

> "When addressing an application for post conviction relief, the trial justice applies the standard used for awarding a new trial. * * * This standard involves the application of a two-part test. To satisfy the first part, the threshold test, the trial justice must determine (1) if the newly discovered evidence actually is newly discovered or available only since the trial, (2) if the petitioner was diligent in attempting to discover the evidence for use at the original trial, (3) that the evidence is not merely cumulative or impeaching but is also material to the issue, and (4) that the evidence is of a kind that would probably change the verdict at a new trial." *Mastracchio*, 698 A.2d at 713 (quoting *McMaugh v. State*, 612 A.2d 725, 731 (R.I.1992)). "'[T]he second part of the test requires the trial justice to decide whether the evidence is credible enough to warrant a new trial.'" *State v. Evans*, 725 A.2d 283, 289 (R.I. 1999).

After examining Powers' arguments, we adopt a multifaceted approach. In the first instance, Powers contends that certain exculpatory ballistic evidence prepared by Trooper Arnold was not disclosed. In particular, Powers avers that the following documents were withheld: (1) a transmittal letter of the eight shells and one recovered shell, dated March 24, 1982 (exhibit No. 10); (2) a document containing a notation indicating that the .22 caliber cartridge casing recovered from the crime scene was "resubmitted by Det. Jerome Bessell 3/24/82" (exhibit No. 5);[6] and (3) a document indicating the comparison results of eight .22 caliber cartridge casings submitted to Trooper Arnold on March 24, 1982, and returned to Detective Bessell (exhibit No. 11). Powers claims that these nondisclosures deprived him of certain exculpatory information, namely, that the .22 caliber cartridge casing found at the crime scene was resubmitted to Trooper Arnold for additional comparison testing on March 24, 1982, and that the results therefrom indicated that the firing pin impression on the single cartridge casing did not match the firing pin impressions on the eight shell casings retrieved from the firing range. According to Powers' reasoning, these results apparently indicated that the single cartridge casing found at the E–Mart gas station could not have been fired from the alleged murder weapon (serial number 649747), since Powers presumed that the eight shell casings retrieved from the firing range were all fired from the same .22 caliber Sport King gun.[7] After a thorough examination of the

6. We are informed that at some time prior to March 24, 1982, the defense was provided a copy of exhibit No. 5, absent the information that the .22 caliber cartridge was resubmitted to Detective Bessell on March 24, 1982.

7. We note the fact that the firing pin impression left upon the .22 caliber cartridge casing found at the murder scene did not match other firing pin impressions left upon other cartridge casings is of no moment to our analysis. The evidence revealed that on July 5, 1981, Deines altered the firing pins in *both* weapon 649747 and weapon 453233. The only relevant cartridges fired prior to the July 5, 1981 altercation was the cartridge found at the murder scene and the cartridges fired at the shooting range. Apparently, Powers argues that since the firing pin impressions on the eight shells retrieved from the firing range did not match the impression found on the cartridge casing found at the murder scene, the state's case is premised upon a fatal flaw. We believe, however, it is Powers who builds a flimsy foundation by concluding that all nine shell casings (one at the murder scene and eight at the firing range) were fired from the same pre-altered .22 caliber Sport King gun (serial number 649747). Although the evidence establishes that the murder scene casing was fired by the .22 caliber Sport King weapon (serial number 649747), the evidence concerning which gun fired the eight cartridges at the firing range is at best, ambiguous. Deines testified that on July 5, 1981, he fired several hundred rounds from numerous

record, the post-conviction relief trial justice stated that the court was

> "satisfied based upon its review of the uncertainties in terms of the passage of time, the maintenance of more than one defense file * * * when coupled with the somewhat detailed cross-examination of Trooper Arnold by [Attorney] DiLauro * * * that information as required with respect to this issue was provided to the defense before the original trial."

We agree and highlight the following colloquy, which, in our opinion, clearly indicates defense counsel's knowledge that: (1) the single casing discovered at the gas station was resubmitted by Detective Bessell on March 24, 1982; (2) the eight shell casings retrieved at the firing range were forwarded to Trooper Arnold for testing on March 24, 1982; and (3) the results therefrom indicated dissimilar firing pin impressions.

> **Mr. DiLauro:** *"On March 24, 1982, eight .22 caliber discharge[d] cartridge casings were submitted to you for testing, is that correct?"*
>
> **Trooper Arnold:** *"That is correct."*
>
> **Mr. DiLauro:** "And please describe the circumstances behind your being given those eight discharge[d] cartridge casings?"
>
> " * * * * "
>
> **Trooper Arnold:** "I was given those casings by Detective Jerome Bessell * * * and I was informed by him that these were casings recovered, I believe, by a gunsmith who worked on these two pistols * * *."
>
> " * * * * " ʹ

weapons, although apparently, only eight shell casings were saved. Moreover, in his 1982 trial testimony, Trooper Arnold opined that the eight shells "were all fired by the same unknown weapon," and in his 1996 post-conviction relief testimony, Powers' ballistic evidence expert James E. McDonald (McDonald) concluded that "[t]hose eight shells were—positively no question about it * * * were fired from * * * the Field King semi auto handgun [(serial number

> **Mr. DiLauro:** "So, after you determined—*you did determine that [the eight cartridge casings] were all fired by the same weapon, is that correct?"*
>
> **Trooper Arnold:** *"That is correct."*
>
> **Mr. DiLauro:** "What did you do after you made that determination?"
>
> **Trooper Arnold:** "I then compared them against * * * the discharge[d]—Stinger cartridge casing [found at the crime scene.]"
>
> **Mr. DiLauro:** "And what were the results of your tests at that point?"
>
> **Trooper Arnold:** *"That the extractor markings on the eight submitted casings, on March 24, were similar to the extractor markings on [the cartridge casing found at the crime scene]."* However, there were insufficient markings as far as microscopic markings, to make a positive identification that they were fired in the same weapon. *"I also noted that the firing pin impression on those eight cartridge casing[s] submitted on the 24th, was a square shape firing pin, completely dissimilar to the firing pin impression on [the casing found at the crime scene]* and the firing pins in [the two .22 caliber weapons seized from Deines]. I also noted that the firing pin location was in the same areas as these two high-standard pistols, along with the extractor location."
>
> " * * * * "
>
> **Mr. DiLauro:** "Did you compare those breechface [*sic*] markings to the breechface [*sic*] markings on [the casing found at the murder scene?]"

453233)], all of them * * * [, and there is n]o way the[y] could have been fired from [the Sport King handgun (serial number 649747)]." Although McDonald's testimony was later stricken as it related to Powers' "newly discovered evidence" allegation, we note McDonald's testimony on this point for the purpose of demonstrating Powers' fatal inference that all nine shells were fired from the same pre-altered weapon and thus must contain the same firing pin impressions.

**Trooper Arnold**: *"There were no breechface [sic] markings on those eight cartridge casings submitted on the 24th of March."* (Emphases added.) [8]

In addition to being cognizant of the alleged non disclosed information contained within exhibits Nos. 5 and 11, Attorney DiLauro testified at the post-conviction relief hearing in 1996 that, at the very least, he was aware of the information contained within exhibit No. 10, a document dated March 24, 1982, which indicated transmittal of the eight .22 caliber shell casings retrieved from the firing range and the one .22 caliber shell casing found at the murder scene for comparison testing. We note the following colloquy:

**Mr. Goulart**: "* * * And therefore, you would agree with me, would you not, Mr. DiLauro, that while you may not have actually received this document, Petitioner's 10, you at some point received the information contained in the document prior to the trial, isn't that fair?"

**Mr. DiLauro**: "Well, I must have if I asked questions about it. I must have known something about it."

■ The remaining alleged nondisclosures are equally meritless and require little discussion. For instance, one such alleged nondisclosure concerns Powers' claim that the state did not disclose a meeting wherein Detective Bessell and Prosecutor Schrock drove their witness, the gunsmith Deines, to Boston in order to discuss the ballistic-type evidence with their ballistic expert, Trooper Arnold. According to Powers, this meeting constituted exculpatory evidence subject to discovery due to the fact that at this meeting, Deines was allegedly informed by Trooper Arnold that the firing pin impression left upon the single .22 caliber cartridge casing did not match other firing pin impressions left upon other shell casings purportedly fired by either weapon 649747 or weapon 453233. Deines testified that Trooper Arnold urged him not to discuss this matter with anyone because "it could upset the case."

■ Despite the post-conviction relief trial justice's finding that this Boston meeting did in fact occur, our examination of Rule 16 of the Superior Court Rules of Criminal Procedure reveals nothing that would require the state to disclose the occurrence of a meeting every time a prosecutor interviews a potential witness. *See* Rule 16(a); *State v. Brown*, 709 A.2d 465, 469 (R.I.1998). Moreover, we believe that the circumstances presented by this case are even more attenuated than the rule that Powers would have us adopt because Prosecutor Schrock merely transported Deines to the meeting with Trooper Arnold. There was no evidence that any member of the prosecution team was present during this Boston meeting and there was no evidence that any member of the prosecution team was privileged to any potentially exculpatory information that may have been discussed during this meeting. Furthermore, Trooper Arnold's actions and knowledge cannot be imputed to the prosecution team for the simple reason that he was not an agent of the state nor was he a member of the prosecution team. *See State v. DeCiantis*, 501 A.2d 365, 368 (R.I.1985). Instead, Trooper Arnold was acting in his capacity as an expert witness in this case.

■ Another alleged nondisclosure concerns three monetary payments totaling approximately $1,660 allegedly paid to LeMay. These alleged payments from Detective Moynihan of the Warwick police

8. The emphasized portions of Trooper Arnold's cross-examination testimony in 1982 contradicts Powers' present claim that the state never disclosed exhibit No. 11. This exhibit indicated that the eight .22 caliber casings were submitted to Trooper Arnold on March 24, 1982, and that the results were: "ALL FIRED BY SAME WEAPON," square shape firing pin, "EXTRACTOR MARKINGS SIMILAR TO SLIDE NO. 649747," and "NO BREECH FACE MARKINGS."

department came to light during the 1996 post-conviction relief trial, and according to Powers, constituted exculpatory evidence that should have been disclosed. The post-conviction relief trial justice took "a somewhat dim view of LeMay's present veracity," and in particular, he stated that LeMay's testimony concerning one payment over $1,000, was "incredible." [9] Even if LeMay's testimony concerning these payments was true, however, Powers once again fails to direct us to anything that would lead us to believe that this information was within the knowledge of the prosecution team. *See State v. Wyche*, 518 A.2d 907, 909 (R.I.1986) ("Nor is the prosecutor responsible for delivery of information outside his custody and control.") (citing *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)).

▮ Finally, Powers directs our attention to an alleged forged statement found on LeMay's person by the North Kingstown police department following an unrelated arrest in April 1983. According to LeMay's post-conviction relief testimony, he was directed by two detectives from the Warwick police department to author a

confession to the E–Mart shooting and to sign Powers' name to it. Following his April 1983 arrest, and the subsequent discovery of the statement, the purported confession was forwarded to the Warwick police department and then transferred to the Department of the Attorney General. After receiving this statement, the prosecution team duly disclosed its existence to Powers. Despite this seemingly straightforward discovery process, on appeal Powers asserts that the state's apparent failure to disclose the purported confession prior to the 1982 trial, even though it was not discovered until April 1983, somehow implicates his constitutional protections. Moreover, Powers argues that even if this statement was turned over in due course, this fact is of no moment because it was the Warwick police detectives who directed LeMay to forge the confession prior to the 1982 trial. Neither argument is persuasive to us.[10]

## VI

### Ineffective Assistance of Counsel Claim

▮ Next, Powers contends that the post-conviction relief trial justice erred by not finding that he was denied effective

9. According to LeMay, this money was given to him by Detective Moynihan, an individual he had known for a long time while living in the same neighborhood. LeMay added that these payments were made in the spirit of a neighbor helping a neighbor and he explicitly rejected the suggestion that the payments were intended to influence his testimony. In fact, during his post-conviction relief trial testimony, LeMay specifically stated that his prior testimony implicating Powers in the murder at the original trial was truthful.

10. Parenthetically, we note that the post-conviction relief trial justice found LeMay's testimony regarding this forged statement to be "incredible." Moreover, although Powers seems to suggest that the statement, which was purportedly forged at the behest of Warwick police detectives, was additional evidence of the state's efforts to frame him for a crime that he did not commit, we believe it is noteworthy that even though the statement was purportedly authored prior to the 1982 trial, the state made no effort to present what

would surely have been devastating evidence to the jury. Also, had the Warwick detectives actually directed the statement to be authored, we believe that Detective Moynihan would have spelled his own name correctly. Furthermore, we are of the opinion that Powers' other similar nondisclosure argument, concerning an alleged phone call from an unidentified person at the Attorney General's office to Swinehart, which was allegedly made prior to Powers' 1982 trial, is also without merit. Initially, we note the post-conviction relief trial justice's finding that Swinehart's testimony concerning this phone call has "absolutely no probative value at all." Assuming, *arguendo*, that a representative from the Attorney General's office did contact Swinehart, we conclude that the post-conviction relief trial justice correctly observed that "[t]here just is no evidence that the State had any evidence with respect to Swinehart that it possessed, used, or kept from [Powers] which should have been provided to the defense." *See State v. Wyche*, 518 A.2d 907, 909 (R.I. 1986).

assistance of counsel during the 1982 trial. With respect to this issue, Powers argues that his representation was ineffective because one member of his defense team, Assistant Public Defender Michael DiLauro, had only recently graduated from law school. We reject this argument, and in doing so, note that during this case Attorney DiLauro was co-counsel to William F. Reilly, the Public Defender for the State of Rhode Island, an experienced and respected criminal defense attorney who indeed was described as an "excellent lawyer" during post-conviction relief testimony. Nonetheless, we have also reviewed Attorney DiLauro's 1982 performance and conclude that it was commendable. *See United States v. Cronic*, 466 U.S. 648, 664, 104 S.Ct. 2039, 2050, 80 L.Ed.2d 657, 672 (1984) (young lawyer inexperienced in criminal matters conducting his first jury trial did not justify a presumption of ineffectiveness absent a showing of such an evaluation).

Notwithstanding his first attempt to demonstrate ineffectiveness, Powers also claims that his counsels' failure to retain a ballistic evidence expert to counter the state's expert demonstrates ineffective assistance of counsel. However, the record demonstrates that Powers' defense team did in fact retain a ballistics expert, James E. McDonald (McDonald), prior to the original trial in 1982 and, moreover, that the defense team arranged for McDonald to examine the ballistic evidence on at least two separate occasions.

The first occasion occurred on March 18, 1982, when McDonald traveled to the University of Rhode Island for the purposes of examining the seven cartridge casings previously test-fired by Trooper Arnold, the eight cartridge casings retrieved from the firing range by Swinehart, and the one cartridge casing found at the murder scene. McDonald also intended to conduct test firings of the two .22 caliber weapons in this case (serial number 649747 and serial number 453233). Although the record indicates that McDonald did examine at least some of the cartridge casings on March 18, 1992, he did not test fire either weapon due to the lack of appropriate facilities. Approximately eleven days later, an entourage that included Prosecutor Schrock and Trooper Arnold arrived at McDonald's laboratory in Waterbury, Connecticut, in order to deliver ballistic-related evidence for testing. McDonald, however, refused to accept this evidence and, moreover, he refused to be an expert witness in this case. During the post-conviction relief proceedings McDonald commented, "I said I don't want the case. If I can't examine the evidence the way I examine the evidence, I don't want the case."

Fourteen years later, while preparing for the post-conviction relief trial, McDonald finally did test-fire the same two .22 caliber weapons that had been brought to his Connecticut laboratory in 1982. McDonald opined that the casing found at the E–Mart murder scene could not have been fired from either the Sport King weapon (serial number 649747) or the Field King weapon (serial number 453233).[11] On appeal, Powers asserts that the failure to ensure that the necessary testing occurred in 1982, or in the alternative the failure to procure another favorable ballistic evidence expert, constituted ineffective assistance of counsel.

"This Court has adopted the standard announced by the United States Supreme Court in *Strickland v. Washington*, [466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ] when generally reviewing claims of ineffective assistance of counsel." *La-*

---

11. In his brief to this Court, Powers claims that McDonald's 1996 post-conviction relief testimony not only evinces that his 1982 counsel was ineffective, but also was indicative of newly discovered evidence. Since McDonald's testimony demonstrated only newly discovered *theories*, however, and not newly discovered *evidence*, the post-conviction relief trial justice properly struck McDonald's testimony as it related to his newly discovered evidence claim.

*Chappelle,* 686 A.2d at 926. Under this standard, a two-part test requires that: "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. *See also State v. Brennan,* 627 A.2d 842, 845 (R.I.1993).

■ Applying this standard to the instant case, we· are of the opinion that Powers' ineffective assistance of counsel claim must fail. In doing so, we note that the decision not to call McDonald as an expert witness was a strategic decision made after what appears to have been careful consideration. During the post-conviction relief trial, Attorney DiLauro testified:

"that neither Mr. Reilly or I were very impressed with Mr. McDonald. I remember that we talked about the way in which he had answered our questions, the way in which he had responded to certain things we had asked him, and the colloquy that we had, the three of us after the testing. I remember that Mr. Reilly and I talked about that at some length in the car on the way back to the courthouse [from the University of Rhode Island laboratory]. * * * I can only speak for myself. But my impression of Mr. McDonald was that he wanted to give us an analysis that he thought we were looking for. And we discussed that at length in the car coming back [to the courthouse] after the testing. * * * [A]t some point we did decide that based upon everything, that we would not call him as a witness in the case."

Moreover, defense counsels' decision not to retain another ballistic evidence expert witness and instead to embark upon a different defense strategy by pointing the finger of guilt elsewhere, did not deprive Powers of a " 'trial [that] cannot be relied on as having produced a just result.' " *Tarvis v. Moran,* 551 A.2d 699, 700 (R.I. 1988). *See also Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695 ("In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.").

## VII

### Summary Judgment Motion

■ Lastly, we reject Powers' claim that the post-conviction relief trial justice improperly denied his motion for summary judgment after the state failed to respond timely to a request for admissions. Although the state has inadequately addressed this issue on appeal, we are nonetheless of the opinion that the post-conviction relief trial justice did not abuse his discretion in permitting the state's answers out of time and therefore properly denied Powers' motion for summary judgment. *See Senn v. Surgidev Corp.,* 641 A.2d 1311, 1319 (R.I.1994) ("In certain cases * * * the interests of the parties, and the interests of the judicial system are better served by permitting the parties to address the merits of the claims and defenses asserted in the lawsuit rather than allowing an escalated discovery conflict effectively to close the courthouse doors."). *See also French v. United States,* 416 F.2d 1149, 1153 (9th Cir.1969); *Cardi Corp. v. State,* 524 A.2d 1092, 1094 (R.I.1987). We note that the post-conviction relief trial justice employed his discretion to fashion what he considered to be a more appropriate sanction.

### Conclusion

In sum, we have conscientiously reviewed all of Powers' legal arguments and,

to quote the post-conviction relief trial justice, "[t]he state of the record before the Court is such that there is no probative and credible evidence with respect to any of the enumerated issues." We reject them in whole. The applicant's appeal is denied and dismissed. The judgment appealed from is affirmed and the papers in this case are remanded to the Superior Court.

Justice BOURCIER did not participate.